105 T.C. No. 27


UNITED STATES TAX COURT


HUGHES A. BAGLEY AND MARILYN B. BAGLEY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 531-93.                    Filed December 11, 1995.


In 1987, P received $150,000 in compensatory damages and
$500,000 in punitive damages pursuant to judgment on a claim for
tortious interference with future employment, with statutory
interest thereon, and $1.5 million in settlement of claims for
tortious interference with future employment, libel, and invasion
of privacy.  P excluded all of these amounts from income under
sec. 104(a)(2), I.R.C.  R determined that the punitive damages and
interest received from the judgment and $1.305 million of the
settlement amount attributable to punitive damages were not
excludable under sec. 104(a)(2), I.R.C., as damages received on
account of personal injuries or sickness.  P paid attorney's fees
in connection with the litigation.  <u>Held</u>: $500,000 of the
settlement proceeds is properly characterized as punitive damages.
<u>Held</u>, <u>further</u>, <u>Commissioner v. Schleier</u>, 515 U.S. ___, 115 S.Ct.
2159 (1995), has effectively overruled our decision in <u>Horton v.
Commissioner</u>, 100 T.C. 93 (1993), affd. 33 F.3d 625 (6th Cir.
1994), insofar as it held that punitive damages, even if
noncompensatory, are excludable from income under sec. 104(a)(2),
I.R.C., if the underlying claim is based on tort or tort type
rights, and to this extent we will no longer follow <u>Horton v.
Commissioner</u>, <u>supra</u>.  <u>Held</u>, <u>further</u>, to the extent P's attorney's
fees are allocable to the taxable portion of P's awards, they are
deductible as a miscellaneous itemized deduction to which the
provisions of sec. 67(a), I.R.C., are applicable.  <u>Held</u>, <u>further</u>,
the interest on the judgment award received by P is not excludable
from income, but attorney's fees applicable to this portion of the
award are deductible as miscellaneous itemized deductions.

Mark Arth, for petitioners.

Jack Forsberg, for respondent.


SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1987 in the amount of $488,976.31. The issues for decision are: (1) What portion, if any, of the amount of $1.5 million paid to Hughes Bagley (petitioner) in settlement of a suit against Iowa Beef Processors, Inc. (IBP), is allocable to punitive damages; (2) whether the $500,000 in punitive damages paid to petitioner pursuant to a judgment against IBP, and the portion, if any, of the $1.5 million paid to petitioner in settlement of his suit against IBP which is allocable to punitive damages, are excludable from petitioner's income under section 104(a)(2)[1] as damages received on account of personal injuries; (3) whether the portion of the legal fees of $768,484.87 paid by petitioner during 1987 in connection with his suit against IBP, which was a contingency fee based on a percentage of the recovery, is properly to be offset against the recovery and, therefore, not includable in income, or is a miscellaneous itemized deduction subject to the adjustment for 2 percent of adjusted gross income under section 67(a); and (4) whether the portion of the legal fees paid by petitioner in 1987, which was computed on an hourly basis, is deductible by petitioner on Schedule C or is an itemized deduction to the extent deductible; (5) whether the amount of $48,575.34 of prejudgment and the amount of $282,772.41 of postjudgment interest paid to petitioner, pursuant to a judgment against IBP, are includable in petitioners' gross income.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided in Sioux City, Iowa, at the time of the filing of their petition in this case, filed their Federal income

---

[1] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

tax return (Form 1040) for the calendar year 1987 with the Internal Revenue Service Center at Atlanta, Georgia.

Petitioner was vice president of retail sales development for IBP from October 1971 until July 1975. In July 1975 IBP terminated petitioner's employment, and in October 1975 IBP and petitioner entered into a settlement agreement resolving certain issues arising from the termination of petitioner's employment. When petitioner left IBP he took with him numerous documents (the Bagley documents), including IBP's weekly profit and loss statements, IBP's monthly production and sales reports, confidential legal memoranda, and memoranda outlining IBP's goals, marketing strategies, and pricing formulas. In late 1976 and early 1977, petitioner met with various individuals who were interested in the activities of IBP, including several attorneys who were contemplating pursuing antitrust litigation against IBP. Petitioner discussed IBP's activities with the attorneys and provided them with access to the Bagley documents. On June 7, 1977, IBP filed a suit against petitioner and others in the U.S. District Court for the Northern District of Iowa seeking $4 million in damages and injunctive relief, including recovery of the Bagley documents (the IBP suit). The suit was Civil No. 77-4040 and was entitled Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters & Butcher Workmen of N. Am., et al. The claims asserted in the suit against petitioner by IBP were breach of contract, breach of fiduciary duty, causing and assisting in another's breach of fiduciary duty, and conspiracy.

In late 1977 the Subcommittee on General Small Business Problems of the U.S. House of Representatives' Committee on Small Business (the subcommittee) initiated an investigation into the meat packing industry. The subcommittee's investigation focused in large part on the activities of IBP. In the course of its investigation, the subcommittee subpoenaed the Bagley documents and various witnesses, including petitioner, for oral testimony. Petitioner testified before the subcommittee on July 23 and 24, 1979. Petitioner's

testimony tended to show that IBP was involved in monopolistic and questionable business practices.

IBP was invited to send a representative to the subcommittee's hearing, but declined to do so. On August 1, 1979, IBP, by its president Robert Peterson, responded to the subcommittee by a 31-page letter (the Peterson letter). The Peterson letter was in answer to testimony given to the subcommittee about IBP and its business practices. Approximately 14 pages of the Peterson letter addressed the testimony of petitioner. The Peterson letter not only addressed the business practices with respect to which petitioner testified, but also included statements which attacked petitioner's character and veracity. Among other things, the Peterson letter alleged that petitioner was "a disgruntled ex-IBP employee" who had "stolen IBP documents", and that petitioner's testimony was "absolutely false" and "constituted perjury", and was "a malicious attempt to blacken IBP's name and belatedly manufacture a defense to IBP's breach-of-fiduciary duty suit" (i.e., the IBP suit). The Peterson letter in essence called petitioner a liar and a thief. IBP sent a copy of the Peterson letter to each member of the subcommittee and requested that it be made a part of the public record. At the time petitioner testified before the subcommittee, he was employed as vice president of Dubuque Packing Co. (Dubuque Packing). Petitioner's employment at Dubuque Packing was abruptly terminated on July 30, 1979. The contents of the Peterson letter had been widely reported by the media.

On October 4, 1979, petitioner filed a suit against IBP in the U.S. District Court for the Northern District of Iowa (Bagley v. Iowa Beef Processors, Inc., Civil No. 79-4087) (the Bagley suit). In the complaint, petitioner asserted five claims against IBP. The five claims asserted were: (1) IBP's suit against petitioner constituted an abuse of process; (2) IBP tortiously interfered with an existing contract of employment by causing Dubuque Packing to terminate petitioner's employment; (3) IBP tortiously

interfered with petitioner's future employment within the meat-packing industry; (4) IBP libeled petitioner by publishing and circulating the Peterson letter; and (5) IBP invaded petitioner's privacy. In the complaint, petitioner asked for $1.5 million in compensatory damages and $10 million in punitive damages.

The jurisdiction of the District Court in the IBP suit and the Bagley suit was based on diversity of citizenship. Some of the claims made by petitioner in his suit against IBP alleged physical injuries which he sustained as a result of IBP's conduct. Petitioner had suffered a heart attack after IBP took his deposition for 1 straight week. This was the third deposition of petitioner that IBP had taken. The IBP suit and the Bagley suit were consolidated for trial. Prior to trial, IBP voluntarily dismissed its claim for compensatory and punitive damages. Petitioner's abuse of process claim was dismissed prior to trial on the ground that the statute of limitations on that claim had expired. The remaining claims were tried before a jury between December 13 and December 29, 1982.

The District Court's instructions to the jury respecting libel, in part, stated that--

> The words complained of by the plaintiff in the Peterson letter, specifically, that "he stole 7 boxes of IBP documents" and that "Bagley's version of IBP's quantity discount program is absolutely false, and ...constitutes perjury," are libelous per se in that the words themselves tend to disgrace and degrade him. Such words create a legal presumption of their falsity thus shifting to the defendant the burden of proving the truth of the statements by a preponderance of the evidence. * * *

With respect to punitive damages for libel, the District Court instructed the jury that--

> If you find that plaintiff has established the essential elements of his libel claim and if you find, on the basis of clear and convincing evidence that the defendant acted with actual malice in publishing the writing in question, then you may award the plaintiff punitive damages in addition to the actual damages assessed. Punitive damages are designed to punish the offender and serve as an example to others. Whether or not to award such

damages, and the amount thereof, are matters confided to you for decision.

The District Court Judge instructed the jury respecting punitive damages generally that--

In addition to the actual damages set out above, plaintiff's complaint seeks to recover what is known in law as punitive damages. These damages are not compensatory in the ordinary sense but are allowed by way of punishment to restrain defendant or others from the commission of like acts in the future. You are instructed that the law permits but does not require a jury to allow punitive damages in certain cases if it is found by the jury that the act causing the injury complained of is malicious or wanton.

On December 30, 1982, the jury returned verdicts in favor of petitioner on all four remaining claims and awarded petitioner actual and punitive damages in the following amounts:

| Claim | Damages | |
|---|---|---|
| | Actual | Punitive |
| Tortious interference with present employment | $150,000 | $500,000 |
| Tortious interference with future employment | 100,000 | 250,000 |
| Libel | 1,000,000 | 5,000,000 |
| Invasion of privacy | 250,000 | 1,500,000 |
| Total | 1,500,000 | 7,250,000 |

On January 10, 1983, IBP filed a motion for judgment notwithstanding the verdict or alternatively for a new trial. IBP's motion contained a number of arguments, including the argument that the damages awarded on the libel claim were duplicated by the awards on the other claims. On June 24, 1983, the District Court entered an order granting IBP's motion with respect to the invasion of privacy claim on the grounds that the award on that claim was duplicative of the award on the libel claim and dismissed that claim. IBP appealed the judgment on the three remaining claims to the Court of Appeals for the Eighth Circuit. The Court of Appeals for the Eighth Circuit, sitting en banc: (1) Reversed the judgment on the libel claim and remanded it for a new trial with instructions; (2) affirmed the judgment on the tortious

interference with present employment claim; and (3) affirmed the judgment on the tortious interference with future employment claim as to liability, but reversed and remanded it as to damages on the ground that an award on that claim could be duplicative of any award on the libel claim. The reversal of the judgment on the libel claim by the Court of Appeals was on the ground that the District Court erroneously instructed the jury that IBP had the burden of proving that the allegedly libelous statements were true. The Court of Appeals in its opinion stated that petitioner must prove that IBP's statements that he "stole" documents and committed "perjury" were, in fact, false and that he must establish that IBP was at fault in publishing these statements. The Court of Appeals held that to recover punitive damages, petitioner, in addition to proving falsity, must prove by clear and convincing evidence that IBP's actions in publishing the challenged statements constituted "actual malice". With respect to the tortious interference with future employment claims, the Court of Appeals held that if petitioner failed to recover on his libel claim, the award of damages should be reinstated, but if petitioner recovered on his libel claim the District Court should then determine to what extent a recovery for tortious interference with future employment would duplicate his libel recovery. To the extent of any duplication, the Court of Appeals held that the award of damages on the tortious interference with future employment claim should not be reinstated. On remand, the District Court entered a judgment on the tortious interference with present employment claim in accordance with the opinion of the Court of Appeals for the Eighth Circuit, and on April 23, 1987, IBP paid petitioner $983,281.23 on this claim. This payment was composed of the following amounts:

| | |
|---|---:|
| Compensatory damages | $150,000.00 |
| Punitive damages | 500,000.00 |
| Costs | 1,933.48 |
| Prejudgment interest | 48,575.34 |
| Postjudgment interest | 282,772.41 |
| Total | 983,281.23 |

On May 29, 1987, petitioner filed a motion in the District Court to reinstate the award of $250,000 in actual damages and $1.5 million in punitive damages which he had received from the jury on the invasion of privacy claim which the District Court had set aside as duplicative of the libel award. Petitioner argued that since the judgment on the libel claim had been reversed and remanded, the invasion of privacy award was no longer duplicative of the libel award and, therefore, should be reinstated. By order dated August 4, 1987, the District Court denied petitioner's motion as premature, but stated in the order that if petitioner decided to forgo retrial of the libel claim, the court would be disposed to reinstate the two damage awards, and that petitioner also would be entitled to reinstatement of those two damage awards if on retrial he failed to establish IBP's liability for libel.

A new trial was scheduled to begin with respect to petitioner's libel claim on September 28, 1987. In August 1987, the parties were required to meet for a settlement conference with a magistrate. Present at the conference were Mr. Richard Smith (Mr. Smith), an attorney for IBP who had been retained after the remand of the case by a new vice president and general counsel of IBP, Mr. Lonny Grigsby (Mr. Grigsby); the magistrate; petitioner's counsel Mr. William J. Rawlings (Mr. Rawlings); and an associate of Mr. Rawlings, Mr. Michael P. Jacobs. For a brief time, Judge McManus was present at the conference. At the settlement conference, the parties agreed to an out-of-court settlement whereby IBP was to pay petitioner $1.5 million, and each party agreed to dismiss the suit against the other. The settlement was agreed to on behalf of IBP by Mr. Smith, Mr. Grigsby, and Mr. Robert Peterson, IBP's president.

In negotiating the settlement, IBP's primary motivation was to resolve the litigation for the lowest possible payment. IBP agreed to the settlement primarily to limit its monetary exposure, resolve its dispute with petitioner

with finality, and avoid further publicity about the case. Given the hazards of litigation, IBP's attorney thought the settlement was favorable for IBP.

The settlement was reached after some give and take by the parties over the amount to be paid to petitioner. The $1.5 million figure was not based on any formula or calculation. During the course of the settlement conference, Mr. Rawlings stated that petitioner would receive punitive damages if the case were retried and that the potential for punitive damages had to be taken into consideration. Mr. Smith, as a representative of IBP, responded that IBP would not agree to pay punitive damages, and Mr. Rawlings replied that that is what he would state if he were in Mr. Smith's position.

It took the parties approximately 2 weeks to agree on the wording of the settlement agreement and to execute the agreement. During this period, there were no further discussions between the parties with respect to the $1.5 million to be paid to petitioner. IBP's principal concern in the drafting of the settlement agreement was that the document clearly release IBP from any and all liability to petitioner, and clearly provide that petitioner was to return the Bagley documents to IBP, and that the settlement remain confidential.

On September 10, 1987, the parties executed a release and settlement agreement which provided:

> This Settlement Agreement and Release is entered into this 10th day of September, 1987, between IBP, INC. (IBP) and HUGHES A. and MARILYN BAGLEY (Bagley).
>
> 1. IBP and Bagley each hereby release and forever discharge the other from all sums of money, accounts, actions, suits, proceedings, claims and demands whatsoever which either of them at any time had or has up to the date hereof against the other for or by reason of or in respect of any act, omission, statement, writing, or cause whatsoever.
>
> 2. Bagley hereby acknowledges payment and receipt in the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) as damages for personal injuries including alleged damages for invasion of privacy, injury to personal reputation including defamation, emotional distress and pain and suffering.

3.  Bagley hereby agrees to return forthwith to IBP all documents previously in Bagley's possession and generated by or at IBP in the course of its business except those which are identified as personal to Bagley.

4.  The parties will file forthwith a stipulation of dismissal of IBP's pending cause of action against Bagley, case number C 77-4040 in the United States District Court for the Northern District of Iowa, Western Division.

5.  The parties will file forthwith a stipulation of dismissal of Bagley's causes of action pending against IBP, case number C 79-4087, in the United States District Court for the Northern District of Iowa, Western Division.

6.  Both parties agree to exercise their best efforts to avoid public disclosure of the settlement terms hereof including this document itself, except as may be by law required.

7.  This release is executed as a compromise settlement of disputed claims, liability for which are expressly denied by the party and/or parties released, and this release does not constitute an admission of liability on the part of either party.

8.  This release and settlement agreement contains the entire agreement between the parties and the terms hereof are contractual and not a mere recital.

Pursuant to the settlement agreement, IBP paid petitioner $1.5 million by check dated September 8, 1987. The invoice for the check indicated the check was issued for "settlement". The check was deposited into Mr. Rawlings' firm's trust account, and the funds were then distributed out of the trust account.

Prior to the filing of the Bagley suit, Mr. Rawlings had a flat hourly fee arrangement with petitioner for an hourly fee of $75 for certain work, and $85 for other work, with respect to the defense of the IBP suit. After the Bagley suit was commenced, Mr. Rawlings and petitioner changed the fee agreement arrangement to a hybrid basis whereby Mr. Rawlings would receive a fee of $50 per hour, plus 25 percent of any judgment or settlement received in the litigation. Petitioner was to pay all expenses incurred in the litigation. During the year 1987, petitioner paid a total of $768,484.87 in legal fees and costs in connection with the IBP litigation. This amount was composed of $378,426.39 paid in connection with the judgment petitioner

received in the tortious interference with present employment claim and $390,058.48 paid in connection with the settlement petitioner received from IBP. Of the $378,426.39 in legal fees paid by petitioner in connection with the tortious interference with present employment claim, $245,336.94 represented the 25-percent contingency fee, and $133,089.93 represented the $50-per hour fixed fee. The fee agreement had been structured with a contingency fee, as well as an hourly fee, because of the difficulty in determining when the attorneys were defending against IBP's claims and when they were prosecuting petitioner's claims, when they were working on the litigation. On their 1987 Federal income tax return, petitioners reported $333,000 of interest received from IBP on Schedule B and deducted $105,869 of legal and accounting fees as miscellaneous itemized deductions on Schedule A. Petitioners showed the receipt of the $150,000 of compensatory damages from the tortious interference with present employment claim, and the receipt of $500,000 of punitive damages from that claim, but excluded both the compensatory damages and punitive damages from their taxable income. Also, petitioners showed the receipt of $1.5 million paid in connection with the settlement, but excluded the entire $1.5 million from their taxable income. The amounts were shown on the tax returns on a Form 8275, Disclosure Statement Under Section 6661.

Respondent, in her notice of deficiency, increased petitioner's income as shown on petitioners' Federal income tax return for the year 1987 by the amount of $500,000, explained as a court-ordered award, and by the amount of $1,305,000, explained as an out-of-court settlement payment. Although the notice of deficiency does not state an explanation for the increases in income, other than stating "it is determined that petitioner received additional income in these amounts which was not reported", respondent, at the trial, stated that these amounts represented the amounts of the awards which were punitive damages, which were not excludable from income under section

104(a)(2) as damages received on account of personal injuries or sickness. Respondent, in the notice of deficiency, reduced petitioner's income by the amount of $534,932, which she computed as the amount of legal fees deductible. The amount was computed by showing legal fees allowable for deduction as $661,013.30, less legal fees claimed per return of $82,038, leaving $578,975.30 of deductible legal fees not claimed on the tax return, which, after the adjustment for 2 percent of adjusted gross income, left a deduction of $534,932.30. Respondent, in the notice of deficiency, stated that these legal fees were applicable to the taxable amount of the court-ordered award and the out-of-court settlement payment and were deductible as miscellaneous deductions subject to reduction by an amount of 2 percent of adjusted gross income.

                              OPINION

The first issue we have for decision is what portion, if any, of the $1.5 million paid to petitioner by IBP in connection with the settlement of all claims (other than the tortious interference with present employment claim, which had been disposed of by an entry of judgment by the District Court pursuant to the opinion of the Court of Appeals for the Eighth Circuit prior to the time of settlement), was paid in lieu of punitive damages.

The parties are not in disagreement as to the law with respect to the allocation of an amount paid in a settlement, but have decided disagreements as to how the law should be applied to the facts of this case. Both parties agree that where an amount is paid in settlement of a case, the critical question is, in lieu of what was the settlement amount paid. McKay v. Commissioner, 102 T.C. 465, 482 (1994); Robinson v. Commissioner, 102 T.C. 116, 126 (1994); Church v. Commissioner, 80 T.C. 1104, 1109 (1983). The parties agree also that all of the facts surrounding the settlement must be considered in determining in lieu of what was the settlement amount paid. McKay v. Commissioner, supra.

Where there is an express allocation contained in the agreement between the parties, it will generally be followed in determining the allocation if the agreement is entered into by the parties in an adversarial context at arm's length and in good faith. Robinson v. Commissioner, supra. However, an express allocation set forth in the settlement is not necessarily determinative if other facts indicate that the payment was intended by the parties to be for a different purpose.

It is petitioners' position that the express language in the settlement agreement provides that the payment is a payment for the actual injuries. In support of this position petitioners quote the provision of the agreement that petitioner acknowledges payment and receipt of the sum of $1.5 million as damages "for personal injuries, including alleged damages for invasion of privacy, injury to personal reputation including defamation, emotional stress, and pain and suffering". It is petitioners' contention that this express language in the settlement shows that the entire payment of $1.5 million was made for a tort type personal injury and, therefore, is excludable under section 104(a)(2). In support of this position, petitioners cite the statement in Glynn v. Commissioner, 76 T.C. 116, 120 (1981), affd. without published opinion 676 F.2d 683 (1st Cir. 1982), that the most important fact in determining the purpose of the payment is "express language [in the agreement] stating that the payment was made on account of personal injuries". See also Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988). Petitioners state that the situation in petitioner's case is almost identical with that in McKay v. Commissioner, supra, and is distinguishable from the situation in Robinson v. Commissioner, supra, relied on by respondent.

In both Robinson v. Commissioner, supra at 127, and McKay v. Commissioner, supra at 483, we recognized that when a settlement agreement clearly allocates the settlement proceeds between tortlike personal injury

damages and other damages, the allocation is generally binding for tax purposes to the extent that the agreement is entered into by the parties in an adversarial context at arm's length and in good faith. Where the taxpayer's claims are settled and the express allocations among the various claims are contained in the settlement agreement, we carefully consider such allocations, if these express allocations were, negotiated at arm's length between the parties. In Robinson v. Commissioner, supra, the parties had made an allocation that was reflected in the final judgment as being 95 percent in payment for mental anguish and 5 percent for lost profits. We held that the allocation in the final judgment did not control the tax effects because it was uncontested, nonadversarial, and entirely tax-motivated, and did not accurately reflect the underlying claims. In the McKay case we stated that the settlement was made by hostile parties who were in an adversarial position with respect to the allocations to be made in the settlement. In that case we pointed out that the taxpayer wanted the settlement award to be as high an amount as possible to compensate him for his losses and wanted the other party to be punished for its behavior. However, the other party wanted to minimize the amount payable to the taxpayer as well as to avoid making any payment on account of the taxpayer's RICO claim. We pointed out that the party dealing with the taxpayer in that case had made it clear that he would not settle if any damages were allocated to RICO claims because of the negative impact that payment of such damages would have on its reputation in the oil industry. The settlement agreement stated affirmatively that no amount was being paid to the taxpayer to satisfy damages under RICO. In that case, the settlement agreement provided:

> "McKay has necessarily acceded to Ashland's demand that nothing be allocated to the RICO Claim, punitive damages claims, or alleged intentional misconduct claims and Ashland and McKay have both relied upon their appellate counsel's consensus estimate of McKay's probability of appellate success with respect to the two other claims. * * * "

McKay v. Commissioner, 102 T.C. at 473.

In the McKay case the record showed that the taxpayer was never given freedom to structure the settlement on his own. In our view, the instant case is distinguishable from the McKay case, since there is no specific statement with respect to punitive damages in the settlement agreement, and the parties structured the settlement agreement by jointly participating in the drafting of the agreement. Although this case is not exactly comparable to Robinson v. Commissioner, supra, there are some aspects of similarity to the Robinson case. Here, the record shows that a judgment had been entered by a jury with respect to the libel claim, and the jury had allowed $1 million of compensatory damages and $5 million of punitive damages. The record shows that the Court of Appeals had held the claim with respect to tortious interference with future employment duplicative of the libel claim, but did not reverse the jury award of $100,000 of compensatory damages and $250,000 of punitive damages, if on retrial petitioner was unsuccessful in the libel suit. The record further shows that the District Court had held that consideration would be given to reinstatement of the invasion of privacy award, of $250,000 in compensatory and $1.5 million in punitive damages if on retrial petitioner was unsuccessful in the libel suit. Therefore, $1 million was likely to be the total petitioner would receive as compensatory damages, if on retrial he succeeded on the libel claim. The record shows that counsel for IBP was unwilling to have a statement made that a portion of the $1.5 million was paid as punitive damages, and the parties agreed to a statement that the sum of $1.5 million was paid as damages for personal injuries, including alleged damages for invasion of privacy, injury to personal reputation, defamation, emotional stress, and pain and suffering. However, there is no specific statement, as there was in McKay v. Commissioner, 102 T.C. 465 (1994), that the damages referred to were not in consideration of any amount that might have been awarded as punitive damages had the case gone to trial. The overall picture here clearly shows that IBP would necessarily have considered the

possibility in a retrial of having to pay punitive damages in the libel suit, and, if IBP won the libel suit, IBP would have to pay $250,000 in punitive damages under the tortious interference with future employment judgment, and possibly $1.5 million as punitive damages on the invasion of privacy claim. The record is also clear here that IBP's primary concern was that it pay as little as possible to dispose of all claims of petitioner, while providing for the return of the Bagley documents, and that the settlement remain confidential. The evidence here shows that both parties worked on the wording of the settlement document and were aware that even if petitioner lost on the retrial of the libel claim the tortious interference with future employment judgment of $100,000 compensatory damages, and $250,000 punitive damages, and possibly the invasion of privacy award would be reinstated. The parties in coming to their agreement were aware that the jury had previously awarded compensatory damages in the libel suit of $1 million and punitive damages of $5 million. Although the record supports the fact that counsel for IBP did not want to show an allocation to punitive damages, the record as a whole, including the discussions and give-and-take between the parties as to the amount to be paid to petitioner, shows that both parties considered the clear possibility of petitioner recovering punitive damages. In fact, the testimony of the attorneys shows that this was in the minds of the attorneys when the negotiations were going on. Furthermore, it was clearly in the interest of both parties not to show an amount allocated to punitive damages. Petitioner's counsel testified that in the beginning of the negotiations he was not aware of whether it might make a difference if a portion were allocated to compensatory damages and a portion to punitive damages, but that between the time of agreement to the total payment of $1.5 million and the completion of drafting the settlement agreement petitioner had consulted a tax attorney and was aware that there could possibly be a difference, since an amount of compensatory damages would clearly be excludable from income.

Here, we have a situation in which the jury award, which was not reversed by the court because of its amount, but rather because of an improper jury instruction as to burden of proof, gave five times as much in punitive damages to petitioner as in compensatory damages, and an award of two and one-half times as much in punitive as compensatory damages that would be reinstated on the claim for tortious interference with future employment if the libel case of petitioner were unsuccessful. Also, there existed the possibility that an additional $1.5 million of punitive damages might be reinstated on the invasion of privacy claim. Based on these facts, we conclude that some of the $1.5 million is properly allocable to punitive damages. However, we do not agree with the amount respondent allocated. The parties were negotiating for an amount in lieu of the overall amount petitioner might recover if the case went to trial. They were considering the risk of trial, as well as items unrelated to the money that petitioner might recover, such as the return of the Bagley documents and the confidentiality of the settlement. All of these factors were important to IBP. Also, it is clear that there would have been, in any event, a $350,000 payment to petitioner for the tortious interference with future employment award, of which $250,000 were punitive damages if petitioner was unsuccessful in the libel suit. Probably there would have been interest on that award. However, clearly IBP did not want to acknowledge a payment of punitive damages. Under these circumstances, it is reasonable to assume that IBP would have paid in settlement to petitioner the entire $1 million that the jury had found he was due as compensatory damages. However, in our view, the remaining $500,000 was in settlement of possible punitive damages petitioner might have recovered. We, therefore, hold that of the $1.5 million settlement amount, $1 million was for compensatory damages and $500,000 was for punitive damages.

Petitioner argues that the amounts received by petitioner as punitive damages, which we have found total $1 million, are properly excludable from

petitioner's income for 1987 under section 104(a)(2). In a fairly recent Court-reviewed case, Horton v. Commissioner, 100 T.C. 93 (1993), affd. 33 F.3d 625 (6th Cir. 1994), we held that the punitive damages received by a taxpayer in a personal injury suit in a Kentucky State court were excludable from the taxpayer's gross income under section 104(a)(2) as "damages received * * * on account of personal injury". Our first basis for excluding punitive damages from a taxpayer's income under section 104(a)(2) was a rejection of the concept that section 104(a)(2) excludes only amounts that restore lost capital, as opposed to amounts that would otherwise constitute gains or accession to wealth. We stated that, in our view, the beginning and end of the inquiry "should be whether the damages were paid on account of 'personal injuries'". We then stated that this inquiry should be answered by determining the nature of the underlying claim. We concluded that once the nature of the underlying claim is established as one for personal injury, any damages received on account of that claim, including punitive damages, are excludable. In the Horton case, we stated that the recent decision of the Supreme Court in United States v. Burke, 504 U.S. 229 (1992), supported the analysis we had adopted. We stated that the taxpayers in the Burke case were claiming that a backpay award in a sex discrimination suit under title VII was excludable from income, but the Supreme Court, in holding to the contrary, stated that in determining whether the section 104(a)(2) exclusion applies, the nature of the claim underlying an award of damages is a critical factor. In Horton v. Commissioner, supra, we held that punitive damages should be excluded from a taxpayer's income under section 104(a)(2). We held that we would follow our own opinion in Miller v. Commissioner, 93 T.C. 330 (1989), rather than the reversal by the Court of Appeals, 914 F.2d 586 (4th Cir. 1990). However, we pointed out that the Court of Appeals for the Fourth Circuit in the Miller case had concluded that under Maryland law punitive damages were not excludable, since they were purely punitive and not

compensatory to the injured party, whereas under Kentucky law punitive damages served both to compensate the injured party and punish the wrongdoer. Therefore, even though we held we would follow our position in the Miller case, we also distinguished the Miller case from Horton v. Commissioner, supra, on the basis of the difference in Kentucky and Maryland law.

The four circuits, in addition to the Fourth Circuit in Miller and the Sixth Circuit in Horton, which have addressed the deductibility of punitive damages have come to the conclusion reached by the Court of Appeals for the Fourth Circuit in Miller that damages which are compensatory in nature are excludable, but damages which are noncompensatory in nature are not excludable under section 104(a)(2). The Court of Appeals for the Ninth Circuit held that punitive damages were not excludable from gross income where the punitive award was not a restoration of lost capital and was "'not intended to compensate the injured party, but rather to punish the tort-feasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct.'" (Hawkins v. United States, 30 F.3d 1077, 1083 (9th Cir. 1994), citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266 (1981)). The Court of Appeals for the Ninth Circuit further found that punitive damages were not awarded to a taxpayer "on account of" personal injury, but rather were awarded "on account of" the tortfeasor's deplorable conduct. Hawkins v. United States, supra at 1080.

In Reese v. United States, 24 F.3d 228 (Fed. Cir. 1994), the court found that punitive damages received by a taxpayer in an action under the District of Columbia Human Rights Act were not excludable since they were in the nature of noncompensatory damages. The Federal Circuit, relying on a District of Columbia case as well as the Supreme Court's language in City of Newport v. Fact Concerts, Inc., supra, and similar cases, and on the legislative history of section 104(a)(2), stated that "it would be inconsistent with the legislative history to treat punitive damages as excludable from income, since

punitive damages in no way resemble a <u>return</u> of capital". <u>Reese v. United States</u>, <u>supra</u> at 233. The Court of Appeals for the Federal Circuit rejected the taxpayer's argument that <u>United States v. Burke</u>, 504 U.S. 229 (1992), was applicable to the issue it was considering on the ground that the <u>Burke</u> case did not involve punitive damages and was, therefore, not controlling or even relevant to the issue. <u>Reese v. United States</u>, <u>supra</u> at 233.

The Court of Appeals for the Fifth Circuit has recently decided that noncompensatory punitive damages are not excludable under section 104(a)(2). In <u>Wesson v. United States</u>, 48 F.3d 894 (5th Cir. 1995), the court concluded, as did the Federal Circuit, that the Supreme Court did not address whether punitive damages are excludable from gross income in <u>United States v. Burke</u>, <u>supra</u>. The Fifth Circuit agreed with the opinions of the Courts of Appeals for the Fourth, Ninth, and Federal Circuits that Congress did not intend that noncompensatory damages be excludable from a taxpayer's income, since such damages did not restore lost capital. <u>Wesson v. United States</u>, <u>supra</u> at 899. Since the Fifth Circuit concluded that under Mississippi law punitive damages were noncompensatory in nature, it held punitive damages not to be excludable from income under section 104(a)(2). <u>Wesson v. United States</u>, <u>supra</u>.[2] On September 19, 1995, the Court of Appeals for the Tenth Circuit issued an opinion in <u>O'Gilvie v. United States</u>, 66 F.3d 1550 (10th Cir. 1995), concluding: "We thus join the majority of the circuits that have addressed this issue in holding that section 104(a)(2) does not exclude punitive damages from income."

Of the six Courts of Appeals which have decided the issue of exclusion from income of punitive damages, five have held that punitive damages are not

---

[2] In <u>Estate of Moore v. Commissioner</u>, 53 F.3d 712 (5th Cir. 1995), revg. T.C. Memo. 1994-4, the Court of Appeals for the Fifth Circuit also held that punitive damages were noncompensatory under Texas law and, therefore, were not excludable from gross income under sec. 104(a)(2).

excludable.[3] The Court of Appeals for the Sixth Circuit, in affirming our Horton case, primarily relied on the language of United States v. Burke, supra at 237, which indicated that in order to determine whether an award is excludable under section 104(a)(2), "we should focus 'on the nature of the claim underlying [the taxpayer's] damages award.'" Horton v. Commissioner, 33 F.3d 625 (6th Cir. 1994), affg. 100 T.C. 93 (1993). The Court of Appeals for the Fourth and Fifth Circuits have looked to State law to determine the nature of punitive damages, while the Federal Circuit has interpreted opinions of the Supreme Court as well as an opinion of the District of Columbia Court of Appeals to determine whether punitive damages were compensatory in nature. Commissioner v. Miller, supra at 589; Moore v. Commissioner, 53 F.3d 712, 715-716 (5th Cir. 1995); Reese v. United States, supra at 231-232.[4]

However, most important to a consideration of whether in this case we should follow our holding in Horton v. Commissioner, supra, is whether our holding in the Horton case has effectively been overruled by the decision of

---

[3] While the Court of Appeals for the Seventh Circuit has yet to address this issue, it has favorably quoted Commissioner v. Miller, 914 F.2d 586 (4th Cir. 1990), revg. 93 T.C. 330 (1989), stating in Kurowski v. Commissioner, 917 F.2d 1033, 1035-1036 (7th Cir. 1990), affg. T.C. Memo. 1989-149:

> Section 104(a)(2) of the Internal Revenue Code provides that gross income does not include "the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness." The rationale of the exemption is to free a taxpayer from liability for an amount received as compensation for a loss of that nature. "[T]he recovery does not generate a gain or profit but only makes the taxpayer whole by compensating for a loss." Commissioner v. Miller, 914 F.2d 586, 590 (4th Cir.1990), citing 1 B. Bittker, Federal Taxation of Income, Estates and Gifts para. 13.1.4 (1981). * * *

[4] While Horton v. Commissioner, 33 F.3d 625 (6th Cir. 1994), affg. 100 T.C. 93 (1993), held that the nature of the claim underlying the taxpayer's damages award decided whether punitive damages were excludable, the Court of Appeals stated, after its conclusion that punitive damages under Kentucky State law were partly compensatory in nature, "this case is distinguishable both from Miller, in which the Fourth Circuit noted that under Maryland defamation law, punitive damages served no compensatory purpose, and from Hawkins, in which the Arizona taxpayers 'concede[d] that the punitive damage award bears no relationship to their injuries and represents pure gain.' (quoting Hawkins v. United States, 30 F.2d 1077, 1080 (9th Cir. 1994).

the Supreme Court in Commissioner v. Schleier, 515 U.S. ____, 115 S.Ct. 2159 (1995).

In the Schleier case, the taxpayer included as gross income the backpay portion, but not the liquidated damages portion, of a settlement award received under the Age Discrimination in Employment Act of 1967 (ADEA). The Commissioner sent the taxpayer a notice of deficiency determining that the taxpayer should have included the liquidated damages portion of his settlement as gross income. We found for the taxpayer, holding that the entire settlement was damages received "on account of personal injuries or sickness" within the meaning of section 104(a)(2) and was, therefore, excludable from gross income, and the Court of Appeals for the Fifth Circuit affirmed. Commissioner v. Schleier, 26 F.3d 1119 (5th Cir. 1994).

The Supreme Court reversed the Court of Appeals. The Supreme Court stated that the taxpayer argued that his damages were excluded from gross income since they were "damages received * * * on account of personal injuries or sickness." Commissioner v. Schleier, supra at 2162. The Supreme Court rejected this argument, stating that the "plain language of [section 104(a)(2)] undermines [the taxpayer's] contention." Commissioner v. Schleier, supra at 2163. The Supreme Court concluded that each element of the settlement must satisfy the requirement under section 104(a)(2), that the damages were received "on account of personal injuries or sickness." Commissioner v. Schleier, supra at 2164. Since the backpay was not directly caused by the injury, section 104(a)(2) did not apply. The Court reasoned:

> In short, section 104(a)(2) does not permit the exclusion of * * * [the taxpayer's] back wages because the recovery of back wages was not "on account of" any personal injury and because no personal injury affected the amount of back wages recovered.

Commissioner v. Schleier, supra at 2164.

The taxpayer argued that liquidated damages fit within section 104(a)(2), citing Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 583

(1942), which held that liquidated damages under the Fair Labor Standards Act (FLSA) were "compensation, not a penalty or punishment".  The Court, however, distinguished liquidated damages recovered under the FLSA from those recovered under the ADEA.  In finding that section 104(a)(2) did not apply to liquidated damages under the ADEA, the Court stated, "'Congress intended for liquidated damages [under the ADEA] to be punitive in nature.'"  Commissioner v. Schleier, 515 U.S. ___, 115 S.Ct. at 2165 (quoting Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126 (1985)).

The taxpayer in the Schleier case made essentially the same argument as the taxpayer in Horton v. Commissioner, 100 T.C. 93 (1993), with regard to United States v. Burke, 504 U.S. 229 (1992).  See Horton v. Commissioner, supra at 96-99.  The taxpayer argued that the Burke case stood for the proposition that a taxpayer need only prove that the underlying claim was based on a "tort or tort type rights" to be excludable under section 104(a)(2).  In addressing the taxpayer's argument that the Burke case limited the analysis under section 104(a)(2) to determining whether recovery is based on "tort or tort type rights", the Supreme Court stated at 515 U.S. ___, 115 S.Ct. at 2167:

> Second, and more importantly, the holding of Burke is narrower than * * * [the taxpayer] suggests.  In Burke, following the framework established in the IRS regulations, we noted that section 104(a)(2) requires a determination whether the underlying action is "based upon tort or tort type rights." United States v. Burke, 504 U.S., at 234, 112 S.Ct., at 1870.  In so doing, however, we did not hold that the inquiry into "tort or tort type rights" constituted the beginning and end of the analysis.  In particular, though Burke relied on Title VII's failure to qualify as an action based upon tort type rights, we did not intend to eliminate the basic requirement found in both the statute and the regulation that only amounts received "on account of personal injuries or sickness" come within section 104(a)(2)'s exclusion.  Thus, though satisfaction of Burke's "tort or tort type" inquiry is a necessary condition for excludability under section 104(a)(2), it is not a sufficient condition.  [Fn. ref. omitted.]

In our view, the Supreme Court in the Schleier case adopted a position contrary to our holding in the Horton case, that the underlying claim is the

"beginning and end" of the analysis.  Under the holding in the <u>Schleier</u> case,
once it is determined that the nature of the claim is based on a "tort or tort
type right", it is necessary to further determine whether the amounts received
were "on account of personal injuries or sickness."

The Supreme Court has made it clear in the <u>Schleier</u> case that damages
which are not compensatory but punitive in nature are not excludable from
gross income under section 104(a)(2).  The Supreme Court stated:

> We agree with * * * [the taxpayer] that if Congress had
> intended the ADEA's liquidated damages to compensate plaintiffs
> for personal injuries, those damages might well come within
> section 104(a)(2)'s exclusion.  There are, however, two weaknesses
> in
> * * * [the taxpayer's] argument.  First, even if we assume that
> Congress was aware of the Court's observation in <u>Overnight Motor</u>
> that the liquidated damages authorized by the FLSA might provide
> compensation for some "obscure" injuries, it does not necessarily
> follow that Congress would have understood that observation as
> referring to injuries that were personal rather than economic.
> Second, and more importantly, we have previously rejected  * * *
> [the taxpayer's] argument:  We have already concluded that the
> liquidated damages provisions of the ADEA were a significant
> departure from those in the FLSA, see <u>Lorillard v. Pons</u>, 434 U.S.
> at 581, 98 S.Ct., at 870; <u>Trans World Airlines, Inc. v. Thurston</u>,
> 469 U.S. at 126, 105 S.Ct., at 624, and we explicitly held in
> <u>Thurston</u>:  "Congress intended for liquidated damages to be
> punitive in nature." <u>Id</u>., at 125, 105 S.Ct., at 624.

> Our holding in <u>Thurston</u> disposes of * * * [the taxpayer's]
> argument and requires the conclusion that liquidated damages under
> the ADEA, like back wages under the ADEA, are not received "on
> account of personal injury or sickness." [Fn. refs. omitted]

<u>Commissioner v. Schleier</u>, 515 U.S. ___, 115 S.Ct. at 2165.

It is clear from this paragraph that if punitive damages are not of a
compensatory nature, they are not excludable under section 104(a)(2).  The
Supreme Court in the <u>Schleier</u> case left open when punitive or exemplary
damages under a particular Federal or State law are intended to be
compensatory.  We, therefore, look to the State law to determine whether the
punitive damages petitioner received were compensatory in nature.

The present case involves Iowa law.  See <u>Bagley v. Iowa Beef Processors,
Inc.</u>, 797 F.2d 632 (8th Cir. 1985).  Under Iowa law, it is clear that punitive
damages are to punish the person who is liable for injury and set an example

to deter future malicious actions. In <u>Team Cent., Inc. v. Teamco, Inc.</u>, 271 N.W.2d 914, 925 (Iowa 1978), the Iowa Supreme Court stated that the purpose of punitive damages is to punish the wrongdoer rather than to compensate the victim. This case is in line with previous cases by the Supreme Court of Iowa. In <u>Meyer v. Nottger</u>, 241 N.W.2d 911, 922 (Iowa 1976), the court stated:

> Exemplary damages are not intended to be compensatory. An award of exemplary damages is never made as a matter of right, but depends upon whether under the facts in a particular case such award is appropriate in order to punish an offending party or discourage others from similar wrongful conduct. [Citations omitted.]

The court in <u>Meyer v. Nottger</u>, <u>supra</u>, concluded that the noncompensatory nature of punitive damages is well established under Iowa law.

> The Supreme Court stated in <u>Commissioner v. Schleier</u>, <u>supra</u> at 2165--

> We have already concluded that the liquidated damages provisions of the ADEA were a significant departure from those in the FLSA * * * and we explicitly held in <u>Thurston</u> "Congress intended for liquidated damages to be punitive in nature." <u>Id.</u>, at 125, 105 S.Ct. at 624. [Citations and fn. ref. omitted.]

We conclude that in <u>Commissioner v. Schleier</u>, <u>supra</u>, the Supreme Court effectively overruled the part of our holding and that of the Court of Appeals for the Sixth Circuit in <u>Horton v. Commissioner</u>, <u>supra</u>, that since the claim as originally made was one for a personal injury or a tortlike claim, even if the punitive damages received were as punishment for malicious actions and an example to deter others from such malicious action, they are excludable from income under section 104(a)(2). We will, therefore, no longer follow our opinion in <u>Horton v. Commissioner</u>, <u>supra</u>, to the extent that it holds that punitive damages which are not compensatory in nature are excludable from income under section 104(a)(2). We, therefore, hold that the $1 million received by petitioner in 1987, composed of $500,000 received on April 23, 1987, pursuant to the judgment entered by the District Court and the $500,000 received on September 8, 1987, as part of the settlement of the remaining

issues in the IBP litigation, which we have held to be for punitive damages, is not excludable from his income under section 104(a)(2).

Petitioner contends that the contingent legal fees paid to his attorney in connection with his litigation with IBP should be a reduction of the amount he received pursuant to judgment or in settlement of the IBP litigation. Respondent contends that these fees, to the extent deductible, should be considered miscellaneous itemized deductions subject to reduction by 2 percent of petitioner's adjusted gross income under section 67(a). The basis of petitioner's contention is that the contingent fee arrangement created a joint venture or partnership between him and the law firm. Petitioner argues that the portions of the judgment and settlement paid over to the law firm pursuant to that contingency fee were not income to petitioner.

Section 7701(a)(2) defines a partnership as "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on". Whether a partnership exists is a question of fact. To be a partnership, the parties, in good faith and acting with a business purpose, must intend to join together in the present conduct of an enterprise. Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); see Estate of Smith v. Commissioner, 313 F.2d 724, 732-733 (8th Cir. 1963), affg. in part, revg. in part and remanding 33 T.C. 465 (1959).

In determining whether a partnership exists for purposes of Federal tax, we have looked at such factors as the agreement of the parties and their conduct in executing its terms; the contributions which each party has made to the venture; each party's control over income and capital, and the right of each to make withdrawals; and, most relevant to the issue here before us, whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share the net losses. This is distinguished from a relationship where one party

receives contingent compensation in the form of a percentage of income for his services rendered to the other party.

Based on the record, we find that there is nothing to indicate that the parties intended the contingency fee arrangement to be a joint venture or partnership. Mr. Rawlings testified that he regarded the agreement between himself and petitioner as nothing more than an arrangement for the payment for his services. Petitioner did not testify with respect to the fee agreement. There is, therefore, no testimony whatsoever that either party intended to form a partnership. Petitioner did not report any profit or loss from any partnership with Mr. Rawlings, but instead claimed a miscellaneous itemized deduction for attorney's fees paid. We, therefore, find petitioner's argument to be without merit.

Petitioner also argues that the $50-per-hour portion of the legal fees he paid is deductible as a Schedule C expense under section 162, since petitioner was "defending his professional name and attempting to protect his occupation as a consultant to the meat packing industry." There is no Schedule C attached to petitioner's 1987 return. There is attached a Form 2106, Employee Business Expenses. Petitioner has made no showing of any connection of the IBP litigation with a consulting business, if any, in which he was engaged in 1987 or any other year. Therefore, to the extent the IBP litigation costs are deductible, they are deductible either as employee business expenses or expenses incurred for the production of income. A deduction for either such expense is a miscellaneous itemized deduction, allowable only to the extent that the total of such deductions exceeds 2 percent of adjusted gross income. See McKay v. Commissioner, 102 T.C. 465, 493 (1994).

Petitioner contends that the statutorily-imposed interest received on the amount of the judgment he received on account of the personal injury he suffered, should be excludable from income. This issue has been before us on

other occasions, and we have held that interest paid on damages awarded in connection with personal injury claims is taxable and not excludable from income, but that the amount of the attorney's fees paid in connection with the interest award is deductible from income.  Kovacs v. Commissioner, 100 T.C. 124, 128-130 (1993), affd. without published opinion 25 F.3d 1048 (6th Cir. 1994); Aames v. Commissioner, 94 T.C. 189, 192 (1990); Riddle v. Commissioner, 27 B.T.A. 1339, 1341 (1933).  We, therefore, hold that the interest received by petitioner on the amount of the judgment in the IBP case is taxable income that is not excludable under section 104(a)(2).

Decision will be entered

under Rule 155.

Reviewed by the Court.

HAMBLEN, CHABOT, COHEN, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WELLS, RUWE, WHALEN, COLVIN, HALPERN, BEGHE, CHIECHI, LARO, AND FOLEY, JJ., agree with this opinion.

VASQUEZ, J., did not participate in the consideration of this opinion.