T.C. Memo. 1998-240


UNITED STATES TAX COURT


WALTER E. HESS AND HELEN L. HESS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8857-97.                    Filed July 2, 1998.


<u>Milton J. Schubin</u> and <u>Sydney E. Unger</u>, for petitioners.

<u>John Aletta</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Walter E. Hess and Helen L. Hess petitioned the Court to redetermine respondent's determination of the following deficiencies in Federal income tax and accuracy-related penalties under section 6662(a):

| | | Accuracy-Related Penalty |
| Year | Deficiency | Sec. 6662(a) |
| --- | --- | --- |
| 1992 | $17,970 | $3,594 |
| 1993 | 167,629 | 33,526 |

Following the parties' concessions, we must decide:

1. Whether section 104(a)(2) excludes from Walter E. Hess's (Mr. Hess) 1993 gross income $425,000 of settlement proceeds he received during that year. We hold it does not.

2. Whether Mr. Hess may deduct for 1993 a $170,040 long-term capital loss on his separation from employment with L.G. Balfour Co. (Balfour). We hold he may not.

3. Whether Mr. Hess is liable for the accuracy-related penalty determined by respondent under section 6662(a) for 1993. We hold he is.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar. Although Helen L. Hess (Mrs. Hess) is a copetitioner, for simplicity and clarity, we refer to Mr. Hess as the sole petitioner.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the exhibits submitted therewith are incorporated herein by this reference. Petitioner and Mrs. Hess

resided in Darien, Connecticut, when they petitioned the Court. They filed 1992 and 1993 Forms 1040, U.S. Individual Income Tax Returns, using the filing status of "Married filing joint return". Petitioner graduated from Duke University with a bachelor of arts degree in business.

Balfour employed petitioner from November 10, 1969, through June 14, 1991, as a commercial representative. Balfour manufactured and sold award items, such as jewelry, plaques, and trophies, and petitioner had the exclusive right to sell Balfour's products in New York City and certain surrounding areas. For each Balfour product sold in petitioner's sales territory, Balfour paid him a commission equal to the difference between the price paid by the purchaser and the price charged petitioner. Balfour issued petitioner Forms W-2, Wage and Tax Statements, listing the total commissions that it paid him during each year.

Balfour let its retiring salesmen sell their sales territories to other Balfour salesmen. On January 1, 1971, Louis S. Myers (Mr. Myers), a retiring salesman, sold petitioner the exclusive right to service Balfour's New York City sales territory. Pursuant to the sale, Mr. Myers transferred his sales accounts to petitioner from January 1, 1971, through December 31, 1973, and petitioner received credits to his commission account

for sales on these accounts after their transfer. Mr. Myers received payments (known as equity payments) equal to the sum of (1) the commissions credited to his account for orders entered on the transferred accounts in the year before their transfer to petitioner and (2) the commissions credited to petitioner's sales account during 1970 from accounts transferred to him before 1970. The equity payments were made in five equal annual installments by way of offsetting debits and credits that Balfour posted to the commission accounts that it maintained for petitioner and Mr. Myers. Balfour did not include the debited commissions in the commissions shown on petitioner's Forms W-2.

Sometime during 1989 or 1990, petitioner and Balfour entered into a dispute over petitioner's commissions. The dispute centered mainly on petitioner's accounts with AT&T, Prudential, and the New York Giants and on a $281,773 commission that Balfour had mistakenly paid petitioner during 1990. Petitioner also was unhappy with the way Balfour manufactured and delivered its products to customers in his sales territory.

During May 1991, petitioner talked to Robbins, Inc. (Robbins), a competitor of Balfour, about leaving Balfour to work for Robbins. One month later, on June 14, 1991, petitioner resigned from Balfour and began working for Robbins as a sales representative. Petitioner continued to work for Robbins through

1993 and beyond, and he continued to sell award products to customers which he had previously serviced for Balfour.

Also on June 14, 1991, petitioner filed suit in Federal District Court (the District Court) against Balfour and its parent corporation, Town & Country Corp. (T&C). Petitioner's complaint and amended complaint asserted claims mainly for: (1) Breach of contract, (2) destruction of his equity in his sales territory, (3) failure to pay wages under Connecticut law, (4) unlawful deductions from wages in violation of Connecticut law, (5) conversion, and (6) constructive discharge. Neither the complaint nor the amended complaint alleged that Balfour or T&C caused petitioner to suffer a physical or emotional injury, and neither pleading prayed for damages from such an injury. In their answers, Balfour and T&C denied the material allegations set forth in petitioner's pleadings, and they asserted various affirmative defenses and counterclaims against him for breach of contract, conversion, replevin, unjust enrichment, breach of duty of loyalty, tortious interference, and unfair competition.

On March 13, 1992, petitioner served Balfour with interrogatory responses identifying and describing his requested damages to include: (1) $3,012,793 for breach of contract, (2) $1.2 million for lost equity, (3) $9,359,849 for failure to pay wages; (4) $1,262,448 for unlawful deduction from wages,

(5) $12,594,636 for conversion of commissions, (6) $1,756,147 for equity in sales territory, and (7) $4,108,158 for constructive discharge. Petitioner alleged that his damages for constructive discharge were: (1) $2,352,011 in commissions owed him for Prudential, AT&T, the New York Giants, and NBA contracts and (2) lost equity payments of $1,756,147 from not being allowed to retire under Balfour's equity program. Petitioner did not assert any claim for damages for a physical or emotional injury purportedly caused by Balfour.

Balfour and petitioner both moved for summary judgment on petitioner's claims of lost equity, statutory wage violations, and conversion, and petitioner also moved for summary judgment on all of Balfour's counterclaims. On December 16, 1992, petitioner, through his attorney, submitted a document to the District Court explaining his position on his claims. This document addressed petitioner's claims for: (1) Commissions owed on the AT&T, Prudential, and the New York Giants contracts, (2) lost commissions on NBA accounts removed from his sales territory, (3) lost equity in his sales territory, (4) violations of Connecticut wage statutes, (5) conversion, (6) wrongful discharge, and (7) Balfour's counterclaims. The document did not address any physical or emotional injury purportedly suffered by petitioner.

On April 26, 1993, Balfour offered petitioner $500,000 to settle the litigation. The offer was made to compensate petitioner for his alleged lost commissions and equity. Petitioner rejected Balfour's offer, and he made a counteroffer of $1.86 million based on the following claims: (1) AT&T contract commissions of $465,000, (2) Prudential contract commissions of $122,000, (3) the New York Giants contract commissions of $50,000, (4) NBA accounts of $15,000, (5) All-Star game commissions of $5,000, (6) pipeline commissions of $14,400, (7) chargebacks of $5,000, (8) lost equity of $660,000, and (9) litigation costs of $125,000.

Later, on or about May 5, 1993, the District Court granted summary judgment in Balfour's favor on petitioner's claims that equity in his sales territory had been destroyed and that Balfour violated Connecticut's wage laws. The wage claims were denied because the court concluded that Massachusetts, rather than Connecticut, law applied. In denying the equity claim, the court held that petitioner had not suffered a loss because he continued to service his former accounts after leaving Balfour. The District Court also denied petitioner's motion for summary judgment on his claims of breach of contract, conversion, and constructive discharge, and it denied his motion for summary judgment on all of Balfour's counterclaims except for replevin.

On June 30, 1993, after petitioner had moved the District Court to reconsider and clarify its rulings, the court affirmed its rulings stating that petitioner's claims for lost equity, whether explicitly or implicitly raised, were all dismissed.

On June 2, 1993, after receiving the court's ruling on the summary judgment motions, Balfour rejected petitioner's $1.86 million offer and offered to settle the litigation for $200,000. This offer included compensation for lost commissions; it did not include any compensation for a purported constructive discharge or physical or emotional injury. Petitioner rejected this offer.

On or about August 26, 1993, petitioner served additional interrogatory responses upon Balfour's attorney identifying his damages as follows: (1) $2,118,180 for breach of contract, (2) $5,848,501 for failure to pay wages, (3) $294,136 for unlawful deduction from wages, (4) $5,317,121 for conversion of commissions, (5) $2,497,734 for equity in sales territory, and (6) $7,968,252 for constructive discharge. Petitioner alleged that his damages for constructive discharge were: (1) $152,092 for commissions earned before June 14, 1991, (2) $421,440 for commissions earned after July 1, 1991, through December 31, 1993, under the AT&T contract, (3) $88,478 for commissions earned from June 15 through December 31, 1991, under the Prudential contract, (4) $2,497,734 in earned equity payments, (5) $2,812,508 in lost

future earnings representing the amount petitioner would have earned if he had worked for Balfour until age 65, and (6) $2 million in emotional distress.

Shortly after the additional interrogatory responses were served on Balfour's attorney, but before she had read them, Balfour and petitioner agreed to settle the litigation by having Balfour pay petitioner $550,000. Balfour intended that this payment would compensate petitioner for commissions purportedly owed him, primarily on the AT&T account; it was not intended to compensate petitioner for a purported constructive discharge or physical or emotional injury. At the time of settlement, neither Balfour nor its attorney knew that petitioner was claiming damages for an emotional injury, and petitioner had never given Balfour any reports detailing such an injury.

Beginning in mid-September 1993, the attorneys for Balfour and petitioner began discussing the language to be used in the settlement agreement, and the attorneys exchanged drafts of the agreement. Petitioner's attorney asked that the agreement allocate $425,000 of the $550,000 settlement payment to a claim for constructive discharge and that the remaining $125,000 be allocated to attorney's fees. Petitioner's attorney made this request because petitioner's accountant had advised the attorney that such an allocation would render the settlement proceeds

nontaxable.  To satisfy the concerns of Balfour's attorney that such an allocation could expose Balfour to liability, petitioner's attorney agreed to insert language in the agreement stating that petitioner would indemnify Balfour for any Federal income tax liability asserted against Balfour for unpaid Federal, State, or local taxes owed on the settlement payment to petitioner.

On November 30, 1993, petitioner and Balfour signed a settlement agreement.  Paragraph 1 stated that petitioner would receive $425,000 and that his attorneys would receive $125,000. The agreement stated that the $425,000 payment settled

    claims for compensatory damages arising out of alleged
    wrongful discharge, * * * [and]

                *    *    *    *    *    *    *

    Neither this Agreement nor any action on the part of
    Balfour or Town & Country required by the Agreement,
    nor the allocation or description of the Settlement
    Amount as recited in paragraph 1 hereof, constitutes an
    admission by Balfour or Town & Country of any unlawful
    or tortious action.

The latter language was placed in the agreement as a caveat to the statement in paragraph 1 that the settlement payment was made to compensate petitioner for his claim of wrongful discharge. The agreement also let petitioner represent Balfour's competitors and sell non-Balfour products or services to Balfour's customers in the New York City territory.

On December 6, 1993, Balfour issued petitioner a check for $425,000, and it issued his attorneys a check for $125,000. Balfour later issued petitioner a Form 1099-MISC, Miscellaneous Income, reflecting the settlement payment, and it deducted the settlement amount on its Federal income tax return as a commission expense.

Petitioner's 1992 Form 1040 claimed a deduction for legal fees of $95,274 from the Balfour litigation. His 1993 Form 1040 did not report any of the settlement payment as income, claiming that it was nontaxable. The 1993 Form 1040 claimed a long-term capital loss of $170,040 in connection with petitioner's termination of employment from Balfour.

Respondent determined that section 104(a)(2) did not apply to exclude the $425,000 payment from petitioner's 1993 gross income. Respondent also determined that petitioner could not deduct the claimed loss because: (1) He had not established his basis in the underlying asset and (2) he had not established that his right to sell products in New York City became worthless during 1992 or 1993.

OPINION

1. Taxability of Settlement Proceeds

We must decide whether petitioner received any of the settlement proceeds on account of a personal injury. To the

extent that he did, the funds are excludable from his gross income. Sec. 104(a)(2). To the extent that he did not, the funds are includable in his gross income. Sec. 61(a). Because respondent determined that none of the proceeds are excludable from petitioner's gross income under section 104(a)(2), petitioner must prove otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Robinson v. Commissioner, 102 T.C. 116, 124 (1994), affd. in part, revd. in part on an issue not relevant herein and remanded 70 F.3d 34 (5th Cir. 1995).

Petitioner argues that the settlement proceeds are excludable from his gross income because the settlement agreement states explicitly that he received the proceeds for a personal injury. Petitioner alleges that his litigation with Balfour was adversarial and that he entered into the allocation set forth in the settlement agreement to "maximize his relatively meager recovery". Petitioner alleges that his cause of action against Balfour for constructive discharge was real. Respondent argues that none of the $425,000 is excludable from petitioner's gross income because none of it was paid to him for a personal injury. Respondent argues that the allocation set forth in the settlement agreement should be disregarded because it was not the product of arm's-length negotiations between Balfour and petitioner.

We agree with respondent that the allocation in the settlement agreement does not control our decision herein, and that none of the settlement proceeds are excludable from petitioner's gross income under section 104(a)(2).  Under section 104(a)(2), settlement proceeds are excluded from gross income to the extent that:  (1) The cause of action underlying the recovery of the proceeds is based upon tort or tort type rights and (2) the proceeds are received on account of a personal injury or sickness.  Section 104(a)(2) is inapplicable when either of these requirements is not met.  Sec. 104(a)(2); Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995); United States v. Burke, 504 U.S. 229, 233 (1992); sec. 1.104-1(c), Income Tax Regs.

The nature of the claim underlying a damage award, rather than the validity of the claim, determines whether damages fall within this two-part test.  United States v. Burke, supra at 237; Robinson v. Commissioner, supra at 125-126.  Ascertaining the nature of the claim is a factual determination that is generally made by reference to the settlement agreement, in light of the facts and circumstances surrounding it.  Key to this determination is the "intent of the payor" in making the payment. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Agar v. Commissioner, 290 F.2d 283, 284

(2d Cir. 1961), affg. per curiam T.C. Memo. 1960-21; Seay v. Commissioner, 58 T.C. 32, 37 (1972).  We ask ourselves:  "In lieu of what were the damages awarded?"  Robinson v. Commissioner, 102 T.C. at 126-127, and the cases cited thereat.  Although the payee's belief is relevant to this inquiry, the ultimate character of the payment rests on the payor's dominant reason for making the payment.  See Agar v. Commissioner, supra at 284; Fono v. Commissioner, 79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).  A payor's intent may sometimes be found in the characterization of the payment in a settlement agreement (or other executed document), but such a characterization is not always dispositive, for example, when the record proves the characterization inconsistent with the realities of the settlement.  Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1977); Robinson v. Commissioner, supra; Threlkeld v. Commissioner, 87 T.C. 1294, 1306-1307 (1986), affd. 848 F.2d 81 (6th Cir. 1988); see Knuckles v. Commissioner, supra at 613; Eisler v. Commissioner, 59 T.C. 634, 640 (1973).

Petitioner argues that the settlement agreement in issue characterizes Balfour's reason for making the settlement payment to petitioner as compensation for a personal injury.  We read the record, however, not to support this characterization.  In

contrast with petitioner's argument that Balfour paid him the settlement as compensation for a personal injury, we find that Balfour's dominant reason for paying the settlement was to compensate petitioner for commissions which Balfour could be called upon to pay him in the event he prevailed in the District Court suit.

Petitioner focuses only on the settlement agreement and asks the Court to do likewise. We decline to do so. In Robinson v. Commissioner, supra, the taxpayers sued a State bank for failing to release a lien on their property. After the jury returned a verdict in their favor for approximately $60 million, including $6 million for lost profits, $1.5 million for mental anguish, and $50 million in punitive damages, the parties to that proceeding settled. In the final judgment reflecting the settlement, which was drafted by the parties and signed by the trial judge, 95 percent of the settlement proceeds was allocated to mental anguish and 5 percent was allocated to lost profits. We held that this allocation did not control the taxability of the proceeds to the taxpayers. We noted that the allocation was "uncontested, nonadversarial, and entirely tax motivated", and that it did not accurately "reflect the realities of * * * [the parties'] settlement." Id. at 129.

The same is true here. While the underlying litigation was certainly adversarial, the parties were no longer adversaries after they agreed on a settlement in principle. Petitioner wanted the settlement payment connected to a tort so that he could maximize his recovery by avoiding taxes on his recovery. Balfour, on the other hand, did not care whether the settlement proceeds were allocated to tortlike personal injury damages vis-a-vis other damages. Balfour's only concerns were that all of petitioner's claims be settled, that nothing be done to compromise its right to deduct the settlement, and that it be indemnified for any tax liability resulting from a mischaracterization of the settlement payment. Balfour, in effect, gave petitioner the green light to allocate the proceeds unilaterally in the manner that he desired, and petitioner did so, allocating the payment in a way that would maximize his recovery to the neglect of the fisc. Petitioner and Balfour did not prepare the settlement agreement by realistically evaluating the damages claimed in the lawsuit and allocating petitioner's recovery accordingly. Nor did the attorneys for the parties there ever discuss the merits of petitioner's constructive discharge claim. As a matter of fact, neither Balfour nor its attorney was even aware that petitioner had just recently made a new claim for $2 million in emotional distress.

In a setting such as this, where the parties to a settlement agreement fail to reflect their agreement accurately in a written document, we will not accept the allocation set forth in that document. That petitioner may have wanted the payment to be characterized as compensation for a tortlike personal injury does not govern the taxation of the payment for purposes of section 104(a)(2). The taxability of the payment, as discussed above, turns on the payor's intent. Because none of the $425,000 payment compensated petitioner for a tortlike personal injury, we hold for respondent on this issue. None of the $425,000 payment is excludable under section 104(a)(2); i.e., the payment is fully taxable under section 61(a). As conceded by respondent as a result of this holding, petitioner may deduct for 1992 $95,274 of legal expenses connected with the lawsuit.

## 2. Deduction of Long-Term Capital Loss

Petitioner must disprove respondent's determination that he may not deduct his reported capital loss of $170,040. Rule 142(a); Welch v. Helvering, 290 U.S. at 115. Deductions are a matter of legislative grace, and petitioner must show that his claimed loss falls within the terms of the statute. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioner argues that he may deduct the loss because he lost the exclusive sales territory that he purchased from Mr. Myers.

We disagree with petitioner's claim that he may deduct his reported loss of $170,040. An individual may deduct an uninsured loss sustained during the taxable year if the loss was incurred: (1) In a trade or business or a for-profit transaction or (2) on account of a casualty or theft. Sec. 165(a), (c). A loss "must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year." Sec. 1.165-1(b), Income Tax Regs; see also sec. 1.165-1(d)(1), Income Tax Regs. The deduction for a loss is limited to the individual's basis in the underlying asset, as determined under section 1011, see sec. 165(b); Leighton v. Commissioner, T.C. Memo. 1995-515, affd. without published opinion 108 F.3d 332 (5th Cir. 1997); Fisher v. Commissioner, T.C. Memo. 1986-141; sec. 1.165-1(c), Income Tax Regs., and the individual bears the burden of proving his or her basis, Millsap v. Commissioner, 46 T.C. 751, 760 (1966), affd. 387 F.2d 420 (8th Cir. 1968). A loss cannot be computed where the individual's basis in the asset is not proven. Towers v. Commissioner, 24 T.C. 199, 239 (1955), affd. on other grounds sub nom. Bonney v. Commissioner, 247 F.2d 237 (2d Cir. 1957); Heckett v. Commissioner, 8 T.C. 841 (1947); see also Fisher v. Commissioner, supra.

Petitioner has not established that his separation from employment with Balfour caused him to incur a loss during 1993 on his New York City sales territory. In fact, a similar claim by petitioner was rejected by the District Court when it ruled that petitioner incurred no loss of equity in his sales territory because he continued to service accounts in that territory after leaving Balfour. As the court stated:

> Hess argues that even though he has taken his accounts to a Balfour competitor, Balfour must compensate him for his equity. In reality, what Hess bought in 1971 from Mr. Myers was the right to service accounts in a specific territory. To now take those accounts from that territory, yet demand payment from Balfour for the value of the territory, flies in the face of contract law, not to mention common sense.

Petitioner also has not proven that he has a basis in the sales territory. Petitioner "paid" Mr. Myers for this territory with income that was not previously taxed to petitioner. Petitioner's "payments" were made through debits to his sales account, and these debits were not included as taxable income on the Forms W-2 that Balfour issued to him. Nor does the record reveal that petitioner otherwise reported these debits as income on his returns. Because petitioner's "payments" for his sales territory were not included in his gross income, he lacks a basis therein which, in turn, precludes him from deducting a loss on its alleged destruction.

3. Accuracy-Related Penalty

Respondent determined that petitioner is liable for an accuracy-related penalty for negligence under section 6662(a) for

1993. Section 6662 imposes an accuracy-related penalty equal to 20 percent of any portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations. See sec. 6662(a) and (b). The term "negligence" means "any failure to make a reasonable attempt to comply with the provisions of [the Code]". Sec. 6662(c). This includes any failure to exercise due care or to do what a reasonable and ordinarily prudent person would do under the circumstances. See Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

Petitioner must prove respondent's determination of negligence wrong. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner's complete argument against this penalty is: "As the foregoing discussion and Proposed Findings demonstrate, * * * [petitioner] had a solid basis for * * * [his] tax position. No grounds exist for imposing penalties under IRC § 6662(a)." We disagree; we are unable to find that petitioner had a solid basis for his positions herein. Petitioner is a sophisticated and longtime businessman who holds a business degree from Duke University. Yet he deliberately painted his settlement agreement with Balfour to appear that he received the settlement payment for a personal injury although he knew that the payment was intended to compensate him for taxable

commissions.  He also claimed a deduction for a $170,040 loss on his sales territory, knowing that he had no basis therein, that he still worked in this territory after leaving Balfour, and that the District Court had rejected his claim to have suffered such a loss.  We conclude that petitioner is liable for the accuracy-related penalty determined by respondent under section 6662(a) for 1993.

In reaching all our holdings herein, we have considered all arguments made by petitioner and, to the extent not discussed above, find them to be without merit.  To reflect the foregoing,

Decision will be entered

under Rule 155.