T.C. Memo. 2001-48

UNITED STATES TAX COURT

JOHN W. BANKS, II, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOHN W. BANKS, II, AND NORA J. BANKS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18096-97, 18097-97.   Filed February 28, 2001.

<u>William J. Wise</u>, for petitioner John W. Banks, II.

<u>Linda C. Grobe</u> and <u>Claire R. McKenzie</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  The notice of deficiency in docket no. 18096-97 reflects deficiencies of $11,707, $101,168, and $8,772 in the 1988, 1990, and 1991 Federal income tax liabilities, respectively, of John W. Banks, II (petitioner).  The notice of

deficiency in docket no. 18097-97 reflects a deficiency of $24,654 in the 1992 Federal income tax liability of petitioner and Nora J. Banks. By way of an amendment to the answer in docket no. 18096-97, respondent disallowed deductions of $108,306 including a net operating loss (NOL) carryover of $101,365 that petitioner applied to 1988 and alleged a resulting additional deficiency of $10,596 for that year. Respondent also alleged in the amended answer that petitioner was liable for a $5,576 addition to his 1988 tax under section 6651(a)(1).[1]

Following the parties' concessions, including one by respondent that Nora J. Banks has no deficiency for 1992 because she qualifies for relief from joint liability on a joint return under section 6015, we must decide:

1. Whether petitioner's gross income includes any of the settlement proceeds which he received from an action based, in part, on Title VII of the Civil Rights Act of 1964 (title VII), Pub. L. 88-352, 78 Stat. 253;

2. Whether petitioner may deduct an NOL in any of the subject years;

3. Whether petitioner's 1992 gross income includes the items of income discussed below;

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

4.  Whether petitioner is entitled to the deductions described below;

5.  Whether petitioner is liable for the addition to tax determined by respondent under section 6651(a)(1); and

6.  Whether petitioner is entitled to relief from joint liability on a joint return under section 6015(c) for 1992.

FINDINGS OF FACT

Petitioner resided in Benton Harbor, Michigan, when the petitions in these cases were filed.  From 1972 through July 14, 1986, petitioner was employed as an educational consultant by the California Department of Education (DOE).  The DOE terminated petitioner's employment effective July 14, 1986.  Petitioner's termination was upheld on appeal.

In 1983, petitioner filed a charge against the DOE with the Equal Employment Opportunity Commission.  By letter dated April 20, 1984, that commission notified petitioner that he had the right to sue the DOE under title VII.  This letter is a jurisdictional prerequisite to filing suit in Federal District Court under title VII.

On June 28, 1984, petitioner filed a complaint in the United States District Court for the Eastern District of California (District Court) against the DOE and others (Banks I).  The complaint alleged violations under title VII and 42 U.S.C. sec.

1981 (1982). Petitioner filed two amended complaints, the last of which (second amended complaint) was filed by the District Court on January 15, 1985. The second amended complaint alleged unlawful discrimination in employment practices under title VII and 42 U.S.C. secs. 1981 and 1983 (1986). The second amended complaint also alleged claims arising under California law, including claims of intentional infliction of emotional distress and slander. The second amended complaint sought the following relief:

ON THE FIRST COUNT

1. For general damages for violation of plaintiff's constitutional rights, harassment, humiliation, and embarrassment in an amount subject to proof;

2. For medical and hospital expenses in an amount subject to proof;

3. For future medical and hospital expenses in an amount subject to proof;

4. For punitive and exemplary damages in an amount determined by the trier of fact;

5. For reasonable attorneys fees incurred in the prosecution of this action;

6. For costs of suit herein incurred;

7. For such other and further relief that the Court may deem just and proper.

ON THE SECOND AND THIRD COUNTS

1. An order requiring defendants and each of them to promote plaintiff to the position of Administrator II, in the State Department of Education;

2.    An order requiring defendants, and each of them, to make whole by appropriate back pay and related employee benefits, and damages to plaintiff because of being adversely affected by discrimination on account of race in the part of defendants;

3.    For general damages to compensate plaintiff for the harm, humiliation, and discrimination suffered in an amount according to proof;

4.    An order granting plaintiff a preliminary and permanent injunction restraining defendants, their agents, successors, employees, attorneys, and all others acting in concert with defendants or under defendants' direction from discriminating on the basis of race or color, and requiring them to undertake remedial action to eradicate any effects of past discrimination;

5.    An order awarding reasonable attorneys' fees and costs; and,

6.    An order granting such further relief as the court deems proper.

ON THE FOURTH COUNT

1. For general damages in the sum of $1,000,000.00 (One Million Dollars);

2.    For medical, hospital and related expenses according to proof;

3.    For lost earnings and losses sustained in the sum of $1,000,000.00 (One Million Dollars);

4.    For exemplary and punitive damages in the sum of $1,000,000.00 (One Million Dollars);

5.    For costs of suit herein incurred:

6.    For such other and further relief that the court may deem just and proper.

ON THE FIFTH COUNT

1.    For general damages to plaintiff's reputation in the sum of $1,000,000.00 (One Million Dollars);

    2.  For special damages for lost profits and losses sustained in the sum of $4,500,000.00 ($4.5 Million);

    3.  For medical, hospital, and related expenses according to proof;

    4.  For exemplary and punitive damages in the sum of $1,000,000.00 (One Million Dollars);

    5.  For costs of suit herein incurred;

    6.  For such other and further relief that the Court may deem just and proper.

ON THE SIXTH COUNT

    1.  For general damages to plaintiff's reputation in the sum of $1,000,000.00 (One Million Dollars);

    2.  For special damages for lost profits and losses sustained [in] the sum of $4,500,000.00 ($4.5 Million);

    3.  For medical, hospital, and related expenses according to proof;

    4.  For exemplary and punitive damages in the sum of $1,000,000.00 (One Million Dollars);

    5.  For costs of suit herein incurred;

    6.  For such other and further relief that the Court may deem just and proper.

On November 25, 1987, petitioner filed in the District Court a second lawsuit (Banks II) against the DOE and others. Petitioner alleged in Banks II violations under title VII and 42 U.S.C. sec. 1983 (1982). Banks II was consolidated with Banks I (Banks cases) on January 19, 1989.

On September 22, 1989, the District Court issued a final pretrial conference order in the Banks cases. The order states,

under the heading "RELIEF SOUGHT", that "Plaintiff seeks only reinstatement, back pay, and attorneys' fees." The order also states, under the heading "ABANDONED ISSUES", that "Plaintiff has abandoned all claims for damages relative to state tort claims, including a claim for intentional and negligent imposition of emotional distress, tortious interference with business relations, and defamation."

Petitioner and the DOE settled the Banks cases before judgment and reflected their settlement in a settlement agreement dated May 30, 1990. The settlement agreement provides in relevant part that "Plaintiff characterizes this payment of $464,000.00 as a payment for personal injury damages suffered after plaintiff's discharge on July 14, 1986."

On July 29, 1986, petitioner filed a voluntary petition in the United States Bankruptcy Court in Sacramento, California, under chapter 7 of the United States Bankruptcy Code. When he did so, petitioner owned an interest in a fully developed subdivision known as Frenchtown Hills Subdivision (Frenchtown Hills) and a 15-percent interest in a real estate partnership known as Auburn Bluffs, Ltd. (Auburn Bluffs). Auburn Bluffs' primary asset was an incomplete subdivision that was not ready to be sold as individual lots. Petitioner's interests in Frenchtown Hills and Auburn Bluffs became part of his bankruptcy estate (estate).

On August 8, 1986, the bankruptcy court appointed a trustee, John Roberts, to administer the estate. Mr. Roberts decided not to have the estate develop either Frenchtown Hills or the Auburn Bluffs property. Mr. Roberts asked the bankruptcy court on August 15, 1986, to approve the estate's employment of a firm to market and sell Frenchtown Hills.

Each lot in Frenchtown Hills was sold during the estate's administration at its fair market value. Petitioner did not object to those values. The estate was unable to sell petitioner's Auburn Bluffs' partnership interest. Instead, the trustee reached a stipulated settlement with Auburn Bluffs' partners. Petitioner paid $10,000 to the estate for the claim against the DOE.

At the request of Mr. Roberts, Michael Owen, a certified public accountant, prepared fiduciary income tax returns for each of the estate's taxable years ended June 30, 1986 through 1990, and for a short period ended on December 31, 1990. Mr. Owen obtained from Mr. Roberts, petitioner, and/or third parties information as to the bases of property sold during the relevant years. Mr. Roberts filed with the Commissioner each of the returns prepared by Mr. Owens. The Commissioner destroyed those returns. Mr. Roberts retained unsigned copies of the returns.

On April 19, 1993, Mr. Roberts filed his final report and proposed distribution with the bankruptcy court as to the estate.

The purpose of that filing was to put all interested parties, including creditors and the debtor, on notice as to his proposal to wind up the estate. On July 19, 1993, the bankruptcy court entered an order approving Mr. Roberts' final report and payment of dividends. On October 29, 1993, Mr. Roberts filed his report of final account and request for closing and discharge of trustee. In 1993, in winding up the estate, the estate made its final distributions to creditors and distributed to petitioner, the debtor, $3,700.

On December 29, 1993, the bankruptcy court ordered the estate closed. The estate did not disclaim any NOLs or any other property, except for some raw land in Arkansas that was abandoned by the trustee. The closing of the estate was delayed because petitioner sued Mr. Roberts, the trustee.

On his 1985 Federal income tax return, petitioner claimed a $61,592 loss from the sale of subdivision lots in Frenchtown Hills and a $48,589 loss from various Auburn Bluffs partnership interests. On his 1986 return, petitioner claimed a $53,192 loss from the sale of subdivision lots in Frenchtown Hills and a $90,036 loss from various Auburn Bluffs partnership interests. On his 1987 return, petitioner claimed a $17,100 loss from the sale of subdivision lots in Frenchtown Hills, a $9,666 loss from various Auburn Bluffs partnership interests, and a $110,617 deduction for an NOL carryover from 1986.

On or about January 30, 1991, petitioner filed an amended return for 1987 in which he increased by $47,788 the cost of goods sold as to his Frenchtown Hills interest. The increase to the cost of goods sold increased his claimed loss from $17,100 to $64,888 and his claimed remaining NOL carryover to $146,458. On his 1988 return, petitioner claimed a $101,365 deduction for an NOL carryover; he did not report an NOL; nor did he report any losses from Frenchtown Hills or Auburn Bluffs. On his 1988 return, petitioner reported a net profit of $62,304 from the sale of lots in the Frenchtown Hills subdivision.

Shortly before this Court's trial of this case, petitioner raised as an issue whether he was entitled to deduct $450,000 as a bad debt or NOL on account of Mr. Roberts' abandonment of a judgment against Milton McGhee. Petitioner won a $483,600 judgment against Mr. McGhee in 1984, which became property of the bankruptcy estate. Petitioner abandoned his claim for a bad debt deduction at trial. Petitioner did not inform William Wise, his attorney in this proceeding, that he had deducted the McGhee bad debt on his 1997 return.

In his petitions and at trial, Mr. Banks asserted that he was entitled to additional losses from Frenchtown Hills, losses which he alleges were abandoned by Mr. Roberts and are deductible in 1990. Mr. Banks deducted $1,060,122 on his 1994 return for "involuntary conversion - French Town Hills - 106122 near Shingle

Springs, CA Loss taken due to court proceedings - details in taxpayers file." Petitioner did not inform Mr. Wise that petitioner had deducted the Frenchtown Hills loss on his 1994 return.

On his 1991 tax return, petitioner showed an NOL carryover of $64,445, which he used to offset $50,843 in income. On his 1992 tax return, petitioner showed an NOL carryover of $182,510, which was used to offset $142,022 in income. In 1988, petitioner was aware he had gross income, including $9,906 in wages, $17,088 in retirement pay, $1,552 in unemployment compensation, and $1,838 in commissions. Not including net profit in the amount of $62,304 reported on Schedule C and shown on line 12, petitioner had gross income in 1988 in the amount of $30,384. Petitioner did not sign his 1988 tax return until March 7, 1990.

OPINION

1. Taxability of Settlement Proceeds

We must decide whether petitioner received any of the settlement proceeds on account of a personal injury. To the extent that he did, the funds are excludable from his gross income. See sec. 104(a)(2). To the extent that he did not, the funds are includable in his gross income. See sec. 61(a). Because respondent determined that none of the proceeds are excludable from petitioner's gross income under section 104(a)(2), petitioner must prove otherwise. See Rule 142(a);

Welch v. Helvering, 290 U.S. 111, 115 (1933); Robinson v. Commissioner, 102 T.C. 116, 124 (1994), affd. in part, revd. in part on an issue not relevant herein and remanded 70 F.3d 34 (5th Cir. 1995).

For 1990, section 104(a)(2) excludes from gross income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness". Damage recoveries fall within this provision to the extent that: (1) The cause of action giving rise to the damages is based upon tort or tort type rights and (2) the damages are received on account of personal injuries or sickness. See Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995). For the taxable year under consideration, personal injuries included both physical and nonphysical injuries. See id. at 329 n.4.

The nature of the claim underlying a damage award, rather than the validity of the claim, determines whether damages meet the two-part Schleier test. See United States v. Burke, 504 U.S. 229, 237 (1992); Robinson v. Commissioner, supra at 125-126. Ascertaining the nature of the claim is a factual determination that is generally made by reference to the settlement agreement, in light of the facts and circumstances surrounding it. Key to this determination is the "intent of the payor" in making the payment. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir.

1965), affg. T.C. Memo. 1964-33; Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960-21; Seay v. Commissioner, 58 T.C. 32, 37 (1972). We ask ourselves: "In lieu of what were the damages awarded?" See Robinson v. Commissioner, supra at 126, and the cases cited therein. Although the payee's belief is relevant to this inquiry, the ultimate character of the payment rests on the payor's dominant reason for making the payment. See Agar v. Commissioner, 290 F.2d at 284; Fono v. Commissioner, 79 T.C. 680 (1982), affd. without opinion 749 F.2d 37 (9th Cir. 1984). A payor's intent may sometimes be found in the characterization of the payment in a settlement agreement, but such a characterization is not always dispositive. Such a characterization is not dispositive, for example, when the record proves the characterization was not the product of bona fide adversarial negotiations. See Bagley v. Commissioner, 105 T.C. 396, 406 (1995); Robinson v. Commissioner, supra; Threlkeld v. Commissioner, 87 T.C. 1294, 1306-1307 (1986), affd. 848 F.2d 81 (6th Cir.1988); see also Knuckles v. Commissioner, supra at 613; Eisler v. Commissioner, 59 T.C. 634, 640 (1973).

Following his abandonment in the District Court of his State law tort claims, petitioner's causes of action in the Banks cases were limited to alleged violations under title VII and 42 U.S.C. secs. 1981 and 1983 (1986). Petitioner settled those claims

before the enactment and effective date of the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071.  As to pre-1991 title VII, the Supreme Court has concluded:

> we cannot say that a statute such as Title VII, whose sole remedial focus is the award of back wages, redresses a tort-like personal injury within the meaning of § 104(a)(2) and the applicable regulations.
> Accordingly, we hold that the backpay awards received by respondents in settlement of their Title VII claims are not excludable from gross income as "damages received ... on account of personal injuries" under § 104(a)(2). [United States v. Burke, 504 U.S. 229, 241-242; fn. refs. omitted.]

On the basis of United States v. Burke, we hold that none of the settlement proceeds attributable to petitioner's pre-1991 title VII claim are excludable from income pursuant to section 104(a)(2).

We turn next to the portion (if any) of the settlement amount that is attributable to petitioner's remaining claims under 42 U.S.C. secs. 1981 and 1983 (1986).

The Supreme Court in United States v. Burke, supra at 240, noted: "Rev. Stat. § 1977, 42 U.S.C. § 1981, permits victims of race-based employment discrimination to obtain a jury trial at which 'both equitable and legal relief, including compensatory and, under certain  circumstances, punitive damages' may be awarded."  The court went on to say unlike title VII actions such actions were tortlike.

With the enactment of 42 U.S.C. sec. 1983, the Congress created a "federal cause of action unknown at common law, [for] the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States.] * * * In the broad sense, every cause of action under § 1983 which is well-founded results from 'personal injuries'." Almond v. Kent, 459 F.2d 200, 204 (4th Cir. 1972). The Supreme Court has declared that 42 U.S.C. sec. 1983 was intended to create a species of tort liability. See Carey v. Piphus, 435 U.S. 247, 253 (1978). This Court has held that damages received in a suit under 42 U.S.C. sec. 1983 for a violation of a first amendment right were excludable under section 104(a)(2). See Bent v. Commissioner, 87 T.C. 236 (1986), affd. 835 F.2d 67 (3d Cir. 1987).

However, in the instant case the pretrial order explicitly limits the remedies sought by petitioner: "Plaintiff seeks only reinstatement, back pay, and attorneys' fees". These remedies are available under title VII. The remedies do not include both equitable and legal relief, including compensatory and punitive damages allowable under 42 U.S.C. secs. 1981 or 1983. On the basis of the pretrial order, we find that petitioner had, at the time of settlement, abandoned his claims under 42 U.S.C. secs. 1981 and 1983. Consequently none of the settlement amount is attributable to a claim of personal injury.

Although the settlement agreement recites petitioner's desired characterization of the entire settlement proceeds as "payment for personal injury damages suffered after plaintiff's discharge on July 14, 1986", we, unlike petitioner, do not accept that statement as a binding characterization of the settlement proceeds.

In Robinson v. Commissioner, 102 T.C. 116 (1994), the taxpayers sued a State bank for failing to release a lien on their property. After the jury returned a verdict in their favor for approximately $60 million, including $6 million for lost profits, $1.5 million for mental anguish, and $50 million in punitive damages, the parties to that proceeding settled. In the final judgment reflecting the settlement, which was drafted by the parties and signed by the trial judge, 95 percent of the settlement proceeds was allocated to mental anguish and 5 percent was allocated to lost profits. We held that this allocation did not control the taxability of the proceeds to the taxpayers. We noted that the allocation was "uncontested, nonadversarial, and entirely tax motivated", and that it did not accurately "reflect the realities of * * * [the parties'] settlement." Id. at 129; accord Hess v. Commissioner, T.C. Memo. 1998-240.

The same is true here. While the underlying litigation was certainly adversarial, the parties were no longer adversaries after they agreed on a settlement in principle. Petitioner

wanted the settlement payment connected to a tortlike personal injury so that he could maximize his recovery by avoiding taxes on his recovery. The DOE, on the other hand, did not care whether the settlement proceeds were allocated to tortlike personal injury damages vis-a-vis other damages. The DOE's dominant concern was that all of petitioner's claims be settled. The DOE, in effect, gave petitioner the green light to state in the settlement agreement his opinion as to the characterization of the settlement proceeds. Petitioner and the DOE did not prepare the settlement agreement by assessing the damages of the lawsuit and allocating petitioner's recovery accordingly.

In a setting such as this, where the parties to a settlement agreement fail to reflect accurately their agreement in a written document, we need not accept the characterization of one of the parties. That petitioner may have wanted the payment to be characterized as compensation for a tortlike personal injury does not govern the taxation of the payment for purposes of section 104(a)(2). The key to the payment's taxability, as discussed above, turns on the payor's intent. That intent, we find, is found in the District Court's pretrial order. Pretrial orders, unless modified, control the subsequent course of a lawsuit, see Fed. R. Civ. P. 16(e), and we find nothing in the record to indicate that the District Court's pretrial order was not in effect when the case settled. As the District Court's pretrial

order states clearly:  "Plaintiff seeks only reinstatement, back pay, and attorneys' fees" and "Plaintiff has abandoned all claims for damage relative to state tort claims, including a claim for intentional and negligent imposition of emotional distress, tortious interference with business relations, and defamation." Because petitioner was not seeking personal injury damages at the time of settlement, we hold for respondent on this issue.  None of the settlement proceeds are excludable under section 104(a)(2).

Petitioner also contends that $150,000 of the proceeds that he paid to his attorney as a contingent fee is excludable from his gross income under Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), revg. in part and affg. in part 28 T.C. 947 (1957)(Cotnam), and its progeny.  Cotnam excluded from a taxpayer's gross income the portion of a damage award paid to the taxpayer's attorney under a contingent fee arrangement.

We disagree that the holding of the Court of Appeals in Cotnam or its progeny control this case.  In Kenseth v. Commissioner, 114 T.C. 399, 412 (2000), we reconsidered our view of the Cotnam holding in light of the views as to that holding expressed by various Courts of Appeals, including the Court of Appeals for the Sixth Circuit Court of Appeals in Estate of Clarks ex rel. Brisco-Whitter v. United States, 202 F.3d 854 (6th Cir. 2000).  We concluded in Kenseth v. Commissioner, supra at

412 that we respectfully continue to believe that <u>Cotnam</u> was wrongly decided and that we would "adhere to our holding * * * [contrary to <u>Cotnam</u>] that contingent fee agreements * * * come within the ambit of the assignment of income doctrine and do not serve * * * to exclude the fee from the assignor's gross income."

The Court of Appeals for the Sixth Circuit, the court to which an appeal of this case lies, agrees with the holding in <u>Cotnam</u> that excludes from a taxpayer's gross income the portion of a damage award paid to the taxpayer's attorney under a contingent fee arrangement. In <u>Estate of Clarks ex rel. Brisco-Whitter v. United States</u>, <u>supra</u> at 856, the Court of Appeals for the Sixth Circuit interpreted applicable State (Michigan) law to operate more or less the same way as the applicable State (Alabama) law in <u>Cotnam</u>. The court held that a portion of the contingent fee paid to the estate's attorneys was not includable in the estate's income. The court rejected the proposition that the assignment of income doctrine enunciated in <u>Lucas v. Earl</u>, 281 U.S. 111 (1930), is applicable to such contingent fee agreements.

Under our so-called <u>Golsen</u> doctrine, see <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we follow the holding of a Court of Appeals to which a case is appealable where that holding is squarely on point. For the reasons stated by the Court of Appeals for the

Ninth Circuit in Benci-Woodward v. Commissioner, 219 F.3d 941, 943 (9th Cir. 2000), affg. T.C. Memo. 1998-395, and Coady v. Commissioner, 213 F.3d 1187 (9th Cir. 2000), affg. T.C. Memo. 1998-291, we conclude, as did the Court of Appeals in those cases, that Estate of Clarks ex rel. Brisco-Whitter v. United States, supra, is distinguishable. Whereas the applicable State law in Estate of Clarks ex rel. Brisco-Whitter v. United States, supra, was that of Michigan, the applicable State law here is that of California. Under California law, an attorney's lien does not confer any ownership interest upon an attorney or grant an attorney any right and power over the suits, judgments, or decrees of their clients. As explained by the California Supreme Court, in interpreting its State law:

> in whatever terms one characterizes an attorney's lien under a contingent fee contract, it is no more than a security interest in the proceeds of the litigation * * * While there is occasional language in cases to the effect that the attorney also becomes the equitable owner of a share of the client's cause of action, we stated more accurately in Fifield Manor v. Finston, 54 Cal.2d 632, 641 (1960), * * * that contingent fee contracts "do not operate to transfer a part of the cause of action to the attorney but only give him a lien upon his client's recovery."

> * * * * * * *

> [t]he conclusion emerges that in litigation an attorney conducts for a client he acquires no more than a professional interest. To hold that a contingent fee contract or any "assignment" or "lien" created thereby gives the attorney the beneficial rights of a real party in interest, with the concomitant personal responsibility of financing the litigation, would be to demean his profession and distort the purpose of the

> various acceptable methods of securing his fee. * * *
> [Isrin v. Superior Court, 403 P.2d 728, 732, 733 (Cal.
> 1965).]

See Benci-Woodward v. Commissioner, supra, where the Court of
Appeals for the Ninth Circuit held that California law did not
operate to exclude a contingent fee payment from the taxpayers'
gross income.

On the basis of California law, as interpreted in Isrin v.
Superior Court, supra, and Benci-Woodward v. Commissioner, supra,
we hold that all of the settlement proceeds, less the $10,000
paid to the estate for the cause of action, must be included in
petitioner's gross income in the year received.

2.  NOL's

Section 1398 applies to this case because petitioner is an
individual who was a debtor in a proceeding under chapter 7 of
the U.S. Bankruptcy Code.  See sec. 1398(a).  Section 1398
provides that a debtor's bankruptcy estate succeeds to the
debtor's NOL carryovers and that the debtor succeeds to the NOL
carryovers which remain when the bankruptcy estate is terminated.
See sec. 1398(g), (i).

Petitioner's estate was created on July 29, 1986, upon his
filing of his petition with the bankruptcy court.  See 11 U.S.C.
sec. 303 (1978).  Because the estate did not terminate until it
closed on December 29, 1993, see 11 U.S.C. sec. 346(i)(2) (1976);
see also Firsdon v. United States, 95 F.3d 444, 446 (6th Cir.

1996); McGuril v. Commissioner, T.C. Memo. 1999-21; Beery v. Commissioner, T.C. Memo. 1996-464, we hold that he was not entitled to claim personally in the subject years a deduction for an NOL that arose prior to the estate's commencement; see sec. 1398(g); see also Kahle v. Commissioner, T.C. Memo. 1997-91.(NOL's determined as of the first day of the debtor's taxable year in which the bankruptcy case commences become part of the estate and no longer belong to the debtor-taxpayer).

3.  Income Items

Items of gross income realized from the assets of a bankruptcy estate after the commencement of a bankruptcy action are generally included in the gross income of the bankruptcy estate rather than the gross income of the debtor.  See sec. 1398(e)(1) and (2).

Petitioner's 1988 individual income tax return shows a net profit of $62,304 from the "Sales - subdivision lots French Hills".  The Frenchtown Hills subdivision was part of the estate in 1988, and the related sales income was includable in the estate's gross income.  We understand Mr. Roberts to have reported that sales income on the estate's 1988 fiduciary return. Accordingly, the $62,304 is excluded from petitioner's gross income for 1988.

Petitioner also seeks to exclude the following sums of interest income: $6,126 (unreported), $5,847 (reported), and

$5,196 (reported) for 1992; and $12,412 and $6,113 (both reported) for 1991.  Petitioner argues that these amounts were reported on the estate's tax returns.  We disagree.  The last return that the estate filed was for 1990.  We conclude that all of the interest income, both reported and unreported, was includable in petitioner's gross income for the respective years in which received.

4.  Deductions

Petitioner seeks deductions for a 1990 or 1991 capital loss, attorney's fees in excess of the $150,000 allowed by the respondent, amounts repaid to his Public Employees Retirement System (PERS) account, amounts allegedly deducted from employee compensation paid to him in an earlier year, and alimony allegedly paid to his ex-wife, Verna Jo Banks.  Petitioner has not proved his entitlement to any of these deductions.  See Rule 142(a).

As to the capital loss, the record does not support petitioner's claim that he is entitled to deduct such a loss in either 1990 or 1991.  The same is true as to the excess attorney's fees.  The only evidence petitioner presented to substantiate his claim to a deduction for attorney's fees paid in 1990 (over and above the $150,000 mentioned above) was his uncorroborated testimony that he paid $45,000 of the settlement proceeds to another attorney in the lawsuits.  We find that

testimony unpersuasive and self-serving.  We also find no substantiation (nor perceive any rationale) for petitioner's claim to a $14,000 deduction for alleged loan repayments to his PERS account, or to a $14,000 deduction for alleged withholding from his pay for his wrongful use of his employer's property.

As to the alimony, petitioner claims a deduction of $72,013.62 for alimony paid to his first wife.  Petitioner paid that sum into court in 1990 in connection with a judgment rendered in his divorce proceeding with Vera Banks.  The court transferred the funds to Vera Banks in 1993.  Petitioner concedes that he deducted this alimony for 1993 but claims that section 461(f) provides that the alimony was deductible in 1990.

While we agree that the deduction would otherwise be allowed in 1990, see sec. 461(f), the circumstances of this case prohibit petitioner from claiming the deduction in that year.  The "duty of consistency", sometimes referred to as quasi-estoppel, is an equitable doctrine that Federal courts apply in appropriate cases to prevent unfair avoidance of tax.  Beltzer v. United States, 495 F.2d 211, 212 (8th Cir. 1974); Cluck v. Commissioner, 105 T.C. 324 (1995); LeFever v. Commissioner, 103 T.C. 525 (1994), affd. 100 F.3d 778 (10th Cir. 1996).  The doctrine "is based on the theory that the taxpayer owes the Commissioner the duty to be consistent in the tax treatment of items and will not be permitted to benefit from the taxpayer's own prior error or

omission." Cluck v. Commissioner, supra at 331. It prevents a taxpayer from taking one position on one tax return and a contrary position on another return for which the limitation period has run. See id. If the duty of consistency applies, a taxpayer who is gaining Federal tax benefits on the basis of a representation is estopped from taking a contrary return position in order to avoid taxes. See id.

Because petitioner's 1993 taxable year is a closed year, and because all of the elements of the doctrine are satisfied, we hold that petitioner is bound by the duty of consistency and prohibited from arguing that the alimony was deductible in 1990, rather than in 1993 as he originally reported.

5. Addition to Tax

Respondent amended his answer to seek an addition to tax for petitioner's failure to file timely his 1988 Federal income tax return. Respondent has the burden of proof on this issue. See Rule 142(a). Section 6651(a)(1) imposes an addition to tax equal to 5 percent per month of the underpayment up to a maximum of 25 percent for untimely filed returns. This addition to tax is not imposed if the failure to file timely was due to reasonable cause and not due to willful neglect. Petitioner's 1988 Federal income tax return was due on April 15, 1989. Petitioner signed his 1988 Federal income tax return on March 7, 1990, and did not file it until September 27, 1990. The record is void of any explicit

explanation as to why petitioner failed to file his return in a timely manner or whether there was a reasonable cause for the untimely filing.  We find that respondent has not discharged his burden, and therefore, we do not sustain respondent's determination that petitioner is liable for the addition to tax under section 6651(a).

6.  <u>Relief From Joint Liability on a Joint Return</u>

On March 13, 2000, petitioner filed with the Commissioner a Form 8857, Request for Innocent Spouse Relief, electing the application of section 6015(c) to 1992 and requesting that any deficiency owed by him be computed under the provisions of section 6015(d).  Petitioner argues that he "was divorced from Nora Banks and his election was timely and made in the circumstances contemplated by the statute."  Respondent denied petitioner's request.

The items that gave rise to the deficiency, i.e., the reported NOL carryforward and the omitted interest, are all items attributable to petitioner.  Section 6015(c) provides relief only to the spouse to whom such items are not attributable.  See also sec. 6015(b).  We hold that petitioner is not entitled to relief under section 6015.

All arguments not herein addressed have been rejected as irrelevant or without merit.  To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.