T.C. Memo. 2003-320

UNITED STATES TAX COURT

DAMIAN GERARD AND LEIGH H. GERARD, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PETER W. HOBLER AND KATHERINE A. HOBLER, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 344-01, 346-01.     Filed November 20, 2003.

Richard D. Lageson and Brenda L. Talent, for petitioners.

Michael W. Bitner and Steven W. LaBounty, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  In these consolidated cases, respondent determined deficiencies in petitioners' 1994 Federal income taxes as follows:

| Petitioners | Deficiency |
|---|---|
| Peter and Katherine Hobler | $188,518 |
| Damian and Leigh Gerard | 100,704 |

In the course of a family shareholder dispute, Bill Maritz, who was chairman and chief executive officer of Maritz Inc., retaliated against his in-laws Katherine Hobler (Katherine) and Damian Gerard (Damian) by terminating their professional relationships with the corporation.  Katherine and Damian asserted claims with respect to these actions.  To settle these claims Maritz Inc. paid $500,000 to Katherine and $250,000 to Damian.  After concessions, the issue for decision is what amounts, if any, of these settlement payments are excludable from petitioners' gross incomes pursuant to section 104(a)(2) as compensation for personal injuries.[1]

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein, along with associated exhibits.  When they petitioned this Court, petitioners Peter and Katherine Hobler resided in Jackson, Wyoming; petitioners Damian and Leigh Gerard resided in St. Louis, Missouri.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code for the year at issue; all Rule references are to the Tax Court Rules of Practice and Procedure.

A.    Corporate and Family Background

Maritz Inc. provides sales motivation programs and travel services.  Its corporate headquarters are in Fenton, Missouri.

At all relevant times, Bill Maritz was chairman and chief executive officer of Maritz Inc.  Before the stock redemptions described below, Bill Maritz and his children (collectively, the Maritz family) owned half the voting shares of Maritz Inc.  The other half was owned by Bill Maritz's sister, Jean Hobler (Jean), along with her husband, Wells Hobler, and their children, Peter, Christopher, and Leigh (collectively, the Hobler family).  In 1987, Damian married Leigh.  In 1990, Katherine married Peter.[2]

B.     Katherine's History with Maritz Inc.

In 1984, before marrying Peter, Katherine began working for Maritz Inc. as an internal auditor.  Highly motivated and well regarded within the company, she received consistently favorable reviews and advanced rapidly.  By June 1993, she had risen to the position of Vice President, Director, Corporate Accounting of Maritz Travel Co., a subsidiary of Maritz Inc., and was receiving an annual salary of $56,700.  At all relevant times while employed at Maritz Inc., Katherine was an at-will employee; i.e., she had no employment contract.

---

[2] At no time did Katherine or Damian own any voting shares of Maritz Inc. in their individual capacities.

C.    Damian's Business History

In 1992, Damian began employment with First Capitol Printing Arts, Inc. (First Capitol), a print shop that produces short-run, two-color prints.  By June 1993, he had acquired one-third of the First Capitol stock and was sales manager.  By July 1994, he had become president of First Capitol.  In September 1994, he became sole owner of First Capitol.

Before the soon-to-be-described events of June 1993, Damian would visit Maritz Inc. each day and "walk the halls", soliciting jobs to bid on.  Typically, he would bid on one to three Maritz Inc. jobs per week.  First Capitol had no written contract to provide services to Maritz Inc.; Damian got work from Maritz Inc. only if he had the low bid.  In the first half of 1993, Damian successfully solicited about $10,000 of business from Maritz Inc., representing less than 2 percent of First Capitol's 1993 gross receipts.

D.    Shareholder Dispute

In 1992, a dispute arose between Bill Maritz and his sister Jean regarding the family business.  Negotiations commenced for Maritz Inc. to redeem the Hobler family voting shares.  The parties sharply disagreed on the redemption price.  On June 25, 1993, Kenneth Suelthaus (Suelthaus), the attorney representing the Hobler family, met with Millard Backerman (Backerman), the attorney representing Maritz Inc.  Suelthaus presented a

preliminary independent appraisal of the Hobler family's Maritz Inc. voting shares and stated that the Hobler family was going to "play hardball" by "asserting their rights" as voting shareholders and electing their own nominees to the Maritz Inc. board of directors.

Learning of these developments, Bill Maritz was vexed. In a June 28, 1993, letter to his brother-in-law Wells Hobler, he stated:

> Based on the news of your family's disruptive and greedy plans which were passed on to Millard [Backerman] by Ken [Suelthaus] * * *, I no longer think of you and Jean and your family as friends of Maritz Inc. or of me and my family or of Maritz management, Maritz people or of the Maritz Board of Directors.
>
>     *     *     *     *     *     *     *
>
> Since Ken Suelthaus emphasized to Millard that <u>all</u> members of your family are fully in support of the actions you are planning, please inform Kathy [Katherine] Hobler that her employment at Maritz will be terminated, and please tell Damian Gerard that he will no longer be welcome to call on Maritz Inc.

In a June 29, 1993, letter to the Maritz Inc. board of directors and members of the Maritz family, Bill Maritz stated that he was going to respond to the "new, tough approach of the Hoblers * * * in an even stronger manner" by terminating Katherine's employment and First Capitol's vendor relationship with Maritz Inc.

On June 30, 1993, at a special meeting of Maritz Inc. vice presidents and corporate officers, Bill Maritz declared that the

Hobler family was the "enemy out to destroy" Maritz Inc. and that consequently Katherine's employment would be terminated and Damian would no longer be in good standing to call on Maritz Inc. Katherine's supervisor then summoned her to his office and informed her that Maritz Inc. was terminating her employment because of the shareholder dispute. About the same time, Damian received a message from Maritz Inc. that the vendor/customer relationship between Maritz Inc. and First Capitol was terminated and that all work in progress should be returned.

E.   Assertion of Katherine's and Damian's Claims

Katherine and Damian immediately retained Suelthaus to represent them in asserting claims against Maritz Inc. On or about June 30, 1993, during a meeting focused primarily on the redemption of the Hobler family shares, Suelthaus discussed with Backerman the recent events concerning Katherine and Damian. Suelthaus asserted claims for severance benefits on Katherine's behalf and for tortious interference with a business relationship on Damian's behalf. He stated that these claims would need to be resolved before any agreement regarding the redemption could ultimately be reached.

F.   Proposed Corporate Resolutions

In a July 1, 1993, letter to the Maritz Inc. board of directors, Jean Hobler protested the actions taken by Bill Maritz

against her daughter-in-law Katherine and her son-in-law Damian.
She stated:

> I am shocked that Bill's response to a business
> situation is to inflict pain on my children.  Does a
> chief executive officer have authority, and is it
> proper corporate policy, to exact retribution against
> shareholders with whom he disagrees?  The Board of
> Directors will have to deal with the issues raised by
> these actions.

At a July 12, 1993, annual shareholders meeting, the Hobler
family elected three members of their choosing, including Ralph
Lobdell, to the 7-member Maritz Inc. board of directors.  That
same day, at a meeting of the Maritz Inc. board of directors,
Ralph Lobdell introduced three resolutions.  One resolution
called for reinstating Katherine in her former position with the
corporation and for compensating her for lost wages and benefits,
as well as "for any emotional and/or physical damages she may
have suffered" as a result of her termination, in amounts to be
determined by a committee of independent directors.  Another
resolution called for reinstating First Capitol as a supplier to
Maritz Inc. and for compensating First Capitol for "lost profits
on the cancelled orders * * * and any other damages (if any) it
may have suffered".  The other resolution called for a committee
to review the termination of the vendor/customer relationship
between First Capitol and Maritz Inc., which it characterized as
First Capitol's "largest customer", as well as the termination of

Katherine's employment with Maritz Inc. The board rejected each resolution by a four-to-three vote.

G.    Personal Effects on Katherine and Damian

Katherine's termination from Maritz Inc. resulted in dramatic changes in her personality. She went from being a positive, energetic, decisive person to someone who, for months after her termination, could not sleep, get out of bed, eat, or make even small decisions. She also suffered embarrassment from the reporting of her termination in the newspaper and local business journal.

Similarly, the termination of Damian's professional relationship with Maritz Inc. caused him shock and embarrassment and adversely affected his relationships with his business partners and customers.

H.    Continued Negotiations

Throughout the remainder of 1993 and into the beginning of 1994, the redemption negotiations continued. In one meeting in the fall of 1993, Peter Hobler, the designated representative of the Hobler family, described emotional damages to Katherine and Damian resulting from Bill Maritz's actions, and Suelthaus asserted tort claims for emotional damage on Katherine's and Damian's behalf.

I.    Tentative Global Agreement

On March 2, 1994, the parties reached a tentative global agreement on the redemption price of the Hobler family shares and on the settlement of Katherine's and Damian's claims.  Pursuant to this tentative agreement, which was contingent on approval by the Maritz Inc. board of directors, Maritz Inc. would pay $750,000 for the release of Katherine's and Damian's collective claims.  Subsequently, Katherine and Damian agreed that Katherine would receive $500,000 and Damian would receive $250,000.

J.    Suelthaus Letters Asserting Claims

Backerman later told Suelthaus that, notwithstanding the tentative settlement agreement, Maritz Inc. could not resolve Katherine's and Damian's claims until Suelthaus asserted them in writing.  Consequently, in a May 17, 1994, letter to Henry Stolar, the General Counsel and Senior Vice President of Maritz Inc., Suelthaus asserted claims on Katherine's behalf as follows:

> On or about June 30, 1993, Ms. Hobler [Katherine] was terminated from her position as an officer of Maritz Travel Company, without reasonable prior notice, entirely without cause, and with the intent to injure her.
>
> Ms. Hobler was injured by the actions of Maritz Inc. and we believe that she is entitled to compensatory damages for wrongful termination of employment, defamation, infliction of emotional distress, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other applicable claims arising out of and/or related to the above event.  It is our intention to prepare a petition to be filed in a court of competent jurisdiction to seek legal redress for the personal damages suffered by

Ms. Hobler as a result of the outrageous conduct of Maritz Inc. through its duly authorized agent.

In a May 18, 1994, letter to Henry Stolar, Suelthaus asserted claims on Damian's behalf as follows:

On or about June 30, 1993, Maritz Inc. terminated its vendor/customer and other relationships with Mr. Gerard [Damian] and his employer, First Capitol Printing Arts, Inc., without reasonable prior notice and entirely without cause, and with the intent to injure Mr. Gerard.

Mr. Gerard was injured by the actions of Maritz Inc. and we believe that he is entitled to compensatory damages for intentional interference with his employment relationship, defamation, infliction of emotional distress, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other applicable claims arising out of and/or related to the above event. It is our intention to prepare a petition to be filed in a court of competent jurisdiction to seek legal redress for the personal damages sustained by Mr. Gerard as a result of the outrageous conduct of Maritz Inc. through its duly authorized agent.

K.   Final Settlement Agreement

On June 8, 1994, a settlement agreement, subject to the approval of the Maritz Inc. board of directors, was signed by Bill Maritz in his capacity as chairman and chief executive officer of Maritz Inc. and in his individual capacity, and by other members of the Maritz and Hobler families, including

Katherine and Damian.  Pursuant to the settlement agreement, the parties agreed that Maritz Inc. would redeem the Hobler family voting shares for about $65 million and would settle any and all claims of Katherine and Damian (including any claims arising from the termination of the vendor/customer relationship between Maritz Inc. and Katherine, Damian, or First Capitol) for $750,000, to be paid "to the Persons and in the amounts set forth on Schedule III".[3]  Schedule III to the settlement agreement

[3] Sec. 11.03 of the settlement agreement (wherein Maritz Inc. is referred to as Maritz) provides in relevant part:

Upon receipt of the sum of $750,000 to be paid by Maritz * * * to the Persons and in the amounts set forth on Schedule III hereto * * *, and for other good and valuable consideration the receipt of which hereby is acknowledged, the Sellers, Jean Maritz Hobler, Wells A. Hobler, Katherine A. Hobler, Leigh Hobler Gerard and Damian Gerard (the "Releasing Parties") and each of them, hereby release and forever discharge each member of the William E. Maritz Family, Maritz * * * and each past, present and future officer, director, shareholder, employee and agent of Maritz (collectively the "Released Parties") from any and all manner of claims, demands, damages, losses, expenses, causes of action, debts, liabilities, controversies, judgments and suits of every kind and nature whatsoever, foreseen, unforeseen or unforeseeable, known or unknown, resulting or to result, now known or which may hereafter be discovered, which the Releasing Parties and each of them, now or in the future may have or hold or at any time heretofore had or held against the Released Parties, or any of them, resulting from or arising out of or in connection with or based on any facts, causes, matters or things existing from the beginning of the world, to the time of consummation of the Initial Closing, including by way of enumeration and not in limitation hereof, all causes, matters or things arising out of or in connection with (a)

(continued...)

describes the payments to be made pursuant to this provision as follows:

> (a) To Katherine A. Hobler, for personal damages as described in correspondence dated May 17, 1994, from Sellers' Attorney [Suelthaus] to the General Counsel of Maritz, the sum of $500,000.00.
>
> (b) To Damian Gerard, for personal damages as described in correspondence dated May 18, 1994, from Sellers' Attorney [Suelthaus] to the General Counsel of Maritz, the sum of $250,000.00.

Section 3.04 of the settlement agreement provides that the "Sellers shall cause" First Capitol to execute a mutual release with Maritz Inc.  As executed on June 9, 1994, and signed by Damian in his capacity as president of First Capitol, the mutual release provided that First Capitol and Maritz Inc. agreed to release all claims against each other, including all claims "in connection with the termination of any and all vendor/customer and other relationships between the Maritz Released Parties, or any of them, and First Capitol."

On June 9, 1994, the Maritz Inc. board of directors considered, authorized, and approved the settlement agreement signed on the previous day.

---

[3](...continued)
Katherine A. Hobler's employment with (and termination of such employment by) Maritz and (b) the termination of any and all vendor/customer and other relationships between Maritz and Damian Gerard and any entity with which he was, is, or hereafter may be, affiliated (including without limitation First Capitol Printing Arts, Inc.) * * *.

L.    "Tax Consistency" Letter

A letter dated June 8, 1994, addressed to Peter Hobler and signed by David Fleisher, the chief financial officer of Maritz Inc., states that "It is understood" by Maritz Inc. that the settlement payments to Katherine and Damian "are, and for income tax purposes shall be treated as, payments in settlement of claims for personal damages" and therefore "do not require reporting on Form 1099 or any other applicable information reporting form."

M.    Settlement Payments, Tax Reporting, and Examination

On July 7, 1994, Katherine and Damian received checks from Maritz Inc. in amounts of $500,000 and $250,000, respectively. Maritz Inc. issued no Form 1099 to Katherine or Damian. Petitioners did not report the settlement payments on their respective 1994 joint Federal income tax returns.

On June 5, 1998, respondent commenced examination of petitioners' 1994 Federal income tax returns.  On October 6, 2000, by separate notices of deficiency, respondent determined that the settlement payments were includable in petitioners' respective taxable incomes for 1994.

- 14 -

OPINION

Petitioners argue that the amounts that Katherine and Damian received pursuant to the settlement agreement with Maritz Inc. were entirely on account of personal injuries within the meaning of section 104(a)(2) and so are excludable from income. Petitioners bear the burden of proof. See Rule 142(a).[4]

I. General Principles

Except as otherwise provided in subtitle A of the Internal Revenue Code, gross income means income from all sources. Sec. 61(a). This statutory provision is construed broadly, unlike statutory exclusions from income, which are construed narrowly. See Commissioner v. Schleier, 515 U.S. 323, 328 (1995).

Section 104(a)(2) excludes from gross income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness". This provision excludes from gross income only amounts that are received both: (1) Through prosecution or settlement of an action based upon tort or tort type rights; and (2) on account of personal injuries or sickness. Commissioner v. Schleier, supra at 333; Bagley v. Commissioner, 105 T.C. 396, 416

_____

[4] Respondent's examination of petitioners' 1994 returns commenced before July 22, 1998. Consequently, sec. 7491(a), which in some circumstances may place the burden of proof on the Commissioner, has no application here. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

(1995), affd. 121 F.3d 393 (8th Cir. 1997). For the taxable year at issue, personal injuries include both physical and nonphysical injuries. See Commissioner v. Schleier, supra at 329 n.4.[5]

If amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement (and not the validity of the claim) governs whether such amounts are excludable from gross income under section 104(a)(2). See United States v. Burke, 504 U.S. 229, 237 (1992); Mayberry v. United States, 151 F.3d 855, 858 (8th Cir. 1998); Seay v. Commissioner, 58 T.C. 32, 37 (1972). "[T]he critical question is, in lieu of what was the settlement amount paid"? Bagley v. Commissioner, supra at 406. This determination is factual. Id.

## II. Were the Underlying Causes of Action Based on Tort or Tort Type Rights?

To satisfy the first Schleier requirement, the taxpayer must prove the existence of a claim based upon tort or tort type rights. See Commissioner v. Schleier, supra at 337. For this purpose, claims must be bona fide but need not be valid or sustainable. See Mayberry v. United States, supra at 859 n.3; Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994); Robinson

---

[5] The Small Business Job Protection Act of 1996 (SBJPA), Pub. L. 104-188, sec. 1605, 110 Stat. 1838, amended sec. 104(a)(2) by limiting the exclusion from gross income to, inter alia, damages received "on account of personal physical injuries or physical sickness." This amendment, however, does not apply to amounts received before Aug. 20, 1996. See SBJPA sec. 1605(d)(1), 110 Stat. 1839. Therefore, the SBJPA amendment is inapplicable to the instant case.

v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part on another issue and remanded 70 F.3d 34 (5th Cir. 1995). State law controls whether the nature of the claim is a tort or tort type right; Federal law controls the Federal tax consequences pertaining to such interests and rights. See Helvering v. Stuart, 317 U.S. 154, 162 (1942); Threlkeld v. Commissioner, 87 T.C. 1294, 1305-1306 (1986), affd. 848 F.2d 81 (6th Cir. 1988).

As reflected in the May 1994 Suelthaus letters, which are cross-referenced in Schedule III of the settlement agreement, which in turn is cross-referenced in section 11.03 of the settlement agreement, Katherine and Damian asserted that their professional relationships with Maritz Inc. were each terminated with "intent to injure" and sought compensatory damages with respect to a variety of claims. These letters assert, in identical language, certain common claims on Katherine's and Damian's behalf; namely, claims for compensatory damages for "defamation, infliction of emotional distress, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other applicable claims". The May 17, 1994, Suelthaus letter asserts on Katherine's behalf an additional claim for "wrongful termination of employment". The May 18, 1994, Suelthaus letter asserts on Damian's behalf an additional claim of "intentional interference with his employment relationship".

Respondent acknowledges on reply brief that the amounts Katherine and Damian received from Maritz Inc. were "paid for the 'personal damages' stated in Suelthaus' May 1994 letters to Henry Stolar". Respondent further concedes that "Missouri recognizes 'intentional infliction of emotional distress' as a personal injury/tort-like cause of action." Respondent does not dispute that Katherine's and Damian's other common claims asserted in the Suelthaus letters (i.e., the claims for defamation, infliction of emotional distress, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life) are also based on personal injury torts.

We also find that Katherine's claim for wrongful discharge from employment constituted a bona fide tort claim. Katherine was an at-will employee; i.e., she had no employment contract. Historically, under Missouri law, an employer could generally discharge an at-will employee with or without cause. See Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. 1988). A number of Missouri appellate decisions, however, have recognized that an at-will employee may have a "cause of action in tort for damages for wrongful discharge", where the discharge is in violation of public policy. Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859, 878 (Mo. Ct. App. 1985); see also Lynch v. Blanke Baer & Bowey Krimko, Inc., 901 S.W.2d 147, 150 (Mo. Ct. App.

1995).[6]  We need not decide whether Katherine would have been able to sustain a claim for wrongful discharge, since it is the nature of the claim and not its validity that matters for present purposes.  See, e.g., <u>Mayberry v. United States</u>, <u>supra</u> at 859 n.3.  We conclude that Katherine asserted a bona fide tort claim for wrongful discharge and that Maritz Inc. recognized it as such.[7]

Similarly, Damian's claim for interference with his employment relationship falls within a larger category of claims for tortious interference with a business relationship.  Such tort claims are recognized under Missouri law.  See <u>Salomon v. Crown Life Ins. Co.</u>, 536 F.2d 1233, 1238 (8th Cir. 1976); <u>Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.</u>, 586 S.W.2d 310, 315 (Mo. 1979).

In sum, we conclude that the first element of <u>Schleier</u> is met with respect to the various claims asserted on Katherine's

---

[6] Noting that it had neither "expressly defined nor adopted the exception", the Missouri Supreme Court in <u>Luethans v. Wash. Univ.</u>, 894 S.W.2d 169, 171 n.2 (Mo. 1995), stated that for purposes of that opinion "we assume that the public policy exception to the at-will employment doctrine exists."

[7] Millard Backerman, the attorney who represented Maritz Inc. in the settlement negotiations, testified that he believed that he made inquiries at his law firm during the negotiations as to whether an at-will employee could have a cause of action for wrongful discharge in Missouri and was told "there is that possibility on some kind of a specialized tort action."

and Damian's behalf in the 1994 Suelthaus letters as incorporated by cross-reference in the settlement agreement.

III.  Were the Payments Received on Account of Personal Injuries or Sickness?

To satisfy the second element of the Schleier test, the taxpayer must show that the payments were received on account of personal injuries or sickness.  See sec. 104(a)(2); Commissioner v. Schleier, 515 U.S. at 337.  For this purpose, each element of a tort settlement must be examined to determine whether there is a direct causal link between the tort and a personal injury. Commissioner v. Schleier, supra at 330.

A.  The Allocation of the Settlement Proceeds Between Katherine and Damian

Respondent contends that because Maritz Inc. initially agreed to pay a lump sum of $750,000 to discharge both Katherine's and Damian's claims, and the Hobler family later decided upon the allocation between Katherine and Damian, it is impossible "to attribute the necessary 'direct causal link' between this lump sum and the alleged personal injuries suffered".  We disagree.

The tentative agreement to provide a lump-sum amount to be divided between Katherine and Damian was contingent upon approval by the Maritz Inc. board of directors.  Before the agreement was approved, Backerman insisted on Suelthaus' asserting Katherine's and Damian's respective claims in writing, which he did.  The

final settlement agreement, as approved by the Maritz Inc. board of directors, expressly provided for $500,000 to be paid to Katherine and $250,000 to be paid to Damian in settlement of their respective claims as asserted in the Suelthaus letters.  On these facts, the manner in which the allocation between Katherine and Damian was reached is not determinative of the existence or absence of a causal link between the payments to each and personal injuries suffered by each.

B. The Effect of the Characterization of the Settlement Proceeds as Being for "Personal Damages"

Petitioners contend that the settlement agreement expressly allocates the settlement payments to Katherine's and Damian's claims for personal injuries, noting that Schedule III of the settlement agreement refers to the settlement payments to Katherine and Damian as being for "personal damages", as does the May 1994 Suelthaus letters and the so-called tax consistency letter.  We disagree with petitioners' contention.

In the first instance, we are unconvinced that Maritz Inc. would have understood the term "personal damages" as used in these various documents to be synonymous with tort type personal injuries.  We believe a more reliable indicator of Maritz Inc.'s intent is found in section 11.03 of the settlement agreement, which expressly indicates that the payments to Katherine and Damian would discharge "all manner of claims" that might arise

from the termination of their professional relationships with Maritz Inc.[8]

Even if we were to assume, however, for sake of argument, that by using the term "personal damages" the parties to the settlement agreement meant to expressly allocate the settlement proceeds exclusively to tort type personal injuries, we still would not find such an allocation dispositive here, for the reasons described below.

An express allocation in a settlement agreement will generally be followed if the parties have entered into the agreement "in an adversarial context at arm's length and in good faith"; such an express allocation is not necessarily determinative, however, "if other facts indicate that the payment was intended by the parties to be for a different purpose." Bagley v. Commissioner, 105 T.C. at 406. Absent an express allocation in the settlement agreement, the most important consideration is the payor's intent in making the payment. Metzger v. Commissioner, 88 T.C. 834, 847-848 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988).

---

[8] Sec. 11.03 of the settlement agreement provides that "Upon receipt of the sum of $750,000 to be paid by Maritz * * * to the Persons and in the amounts set forth on Schedule III hereto", the parties will release and discharge "all manner of claims * * * in connection with or based on any facts, causes, matters or things existing from the beginning of the world", including "all causes, matters or things arising out of or in connection with" the termination of Katherine's and Damian's professional relationships with Maritz Inc.

In key respects the circumstances here are similar to those in LeFleur v. Commissioner, T.C. Memo. 1997-312. In LeFleur, the taxpayer received a lump-sum settlement payment that covered both tortlike personal damages and other damages. The settlement agreement allocated 80 percent of the proceeds to tortlike personal damages. Id. The evidence indicated that although the underlying litigation was adversarial, by the time the settlement agreement was reached, the parties were no longer adversaries. Id. Because the payor was unconcerned with the allocation of the settlement proceeds as between tortlike personal injuries and other injuries, the taxpayer "in effect was able to unilaterally allocate the proceeds" in an attempt to maximize tax advantages for themselves. Id. Consequently, this Court refused to "blindly accept the parties' allocation of settlement proceeds where * * * the allocation is patently inconsistent with the realities of the underlying claims". Id.; see also Bagley v. Commissioner, supra at 406-410; Robinson v. Commissioner, 102 T.C. at 128-134; Burditt v. Commissioner, T.C. Memo. 1999-117; Hess v. Commissioner, T.C. Memo. 1998-240 ("the characterization of the payment in a settlement agreement (or other executed document) * * * is not always dispositive, for example, when the record proves the characterization inconsistent with the realities of the settlement").

In the instant case, as in <u>LeFleur v. Commissioner</u>, <u>supra</u>, the evidence does not suggest that the parties had any adversarial interests in characterizing the settlement payments as being for "personal damages". On the basis of all the evidence, it appears that the "personal damages" characterization occurred after the parties had reached agreement in principle on the settlement. Clearly, petitioners had tax motivations for characterizing the payments as being for personal injuries. The evidence strongly suggests that Maritz Inc. was unconcerned with how the payments were allocated, so long as all potential claims were discharged.[9]

In sum, we are unconvinced that the mere use of the term "personal damages" in various documents, as described above, establishes that Maritz Inc. intended the settlement payments to discharge exclusively claims for personal injuries or sickness. Consequently, we look to all the evidence to determine the nature of the underlying claims for which the payments were made and the intent of Maritz Inc. in making the payments.

---

[9] Millard Backerman testified that he thought "the lion's share" of the tax consistency letter was drafted by Katherine's and Damian's attorney, Kenneth Suelthaus. Petitioners seek to counter this testimony with testimony by David Fleisher, former chief financial officer of Maritz Inc., that the tax consistency letter was "drafted by our lawyers". We find Backerman's testimony more credible in this regard, particularly in light of the fact that Backerman was Maritz Inc.'s attorney in the settlement negotiations.

C.   The Underlying Claims

  1.   Katherine's and Damian's Claims for Personal Injuries

On the basis of all the evidence, we believe that Bill Maritz's actions caused Katherine and Damian to suffer personal injuries.  In particular, Katherine's termination from Maritz Inc. caused her acute emotional distress and resulted in dramatic changes in her personality.  The termination of Damian's professional relationship with Maritz Inc. also caused him emotional distress and damaged his professional reputation.  Such claims were asserted on Katherine's and Damian's behalf in the settlement negotiations with Maritz Inc.  We believe that Maritz Inc. took these claims seriously and intended the settlement payments at least in part to discharge such claims.  Accordingly, we find that the settlement payments were received at least in part through settlement of tort-based claims on account of personal injuries or sickness.  To that extent, the settlement payments are excludable from income pursuant to section 104(a)(2) as amounts received based upon tort rights and on account of personal injuries.  See, e.g., United States v. Burke, 504 U.S. at 235-236 & n.6, 239 (recognizing that section 104(a)(2) covers damages for injuries affecting "emotions, reputation, or character" and "traditional harms associated with personal injury" include "pain and suffering, emotional distress, [and] harm to reputation"); Threlkeld v. Commissioner, 87 T.C. at 1308

(holding that compensatory damages received for malicious prosecution, including compensation for injuries to professional reputation, were excludable under section 104(a)(2)); Gross v. Commissioner, T.C. Memo. 2000-342 (holding that lump-sum settlement payment covering claim for defamation was excludable under section 104(a)(2)); Burditt v. Commissioner, supra (holding that settlement proceeds paid to settle a claim for mental anguish were excludable under section 104(a)(2)); Noel v. Commissioner, T.C. Memo. 1997-113 (holding that settlement proceeds attributable to a claim for tortious interference with contractual rights and prospective business advantages were excludable under section 104(a)(2)).

For the reasons described below, however, we are unpersuaded that Katherine and Damian received the settlement payments exclusively on account of personal injuries or sickness.

### 2. Katherine's Claims for Economic Injuries

On or about June 30, 1993, immediately after Maritz Inc. terminated Katherine's employment, Suelthaus met with Backerman and asserted a claim for severance benefits on Katherine's behalf. About 2 weeks later, the Hobler family, through one of their newly elected Maritz Inc. board members, introduced a resolution to reinstate Katherine in her former position and to compensate her for lost wages and benefits, as well as "for any emotional and/or physical damages she may have suffered" as a

result of her termination. Clearly, then, at least initially, claims were asserted on Katherine's behalf for economic injuries, as well as for emotional and physical damages. There is no suggestion in the record that Maritz Inc. ever received any affirmative indication that Katherine had abandoned her previously asserted claims for economic injuries. Particularly in light of the assertion on Katherine's behalf, in the May 1994 Suelthaus letter, of a claim for wrongful discharge from employment, we are convinced that Maritz Inc. intended the settlement payment to Katherine to discharge her previously asserted and never-withdrawn claims for economic injuries, as well as her claims for personal injuries.

### 3. Damian's and First Capitol's Claims for Economic Injuries

At the meeting between Suelthaus and Backerman on or about June 30, 1993, Suelthaus asserted a claim on Damian's behalf for tortious interference with a business relationship. About 2 weeks later, the Hobler family, through one of their newly elected Maritz Inc. board members, introduced a resolution to reinstate First Capitol as a supplier to Maritz Inc. and to compensate it for "lost profits on the cancelled orders * * * and any other damages (if any) it may have suffered". No resolution was introduced to compensate Damian for any separate injuries he may have suffered, personal or otherwise. We believe at that early juncture in the negotiations, the claims asserted on behalf

of Damian individually were, and would have been perceived by Maritz Inc. as being, part and parcel of the claims for economic injuries asserted on behalf of First Capitol, of which Damian was a significant owner.

The record contains no suggestion that Maritz Inc. ever received any affirmative indication that Damian or First Capitol had abandoned their previously asserted claims for such economic injuries. To the contrary, section 11.03 of the settlement agreement expressly states that the settlement payment to Damian was in discharge of any claims arising from the "termination of any and all vendor/customer and other relationships between Maritz and Damian Gerard and * * * First Capitol Printing Arts, Inc." Section 3.04 of the settlement agreement required First Capitol, for no apparent consideration beyond the $250,000 settlement payment to Damian, to execute a release of any claims against Maritz Inc. On June 9, 1994, Damian executed such a release in his capacity of president of First Capitol. We believe these circumstances show that the $250,000 payment to Damian was intended to discharge economic injury claims previously asserted on behalf of First Capitol as well as related economic injuries and personal injuries asserted by Damian in his individual capacity.

### 4. Allocation of the Settlement Payments

As just discussed, we are convinced that the settlement payments to Katherine and Damian were on account of both personal injuries and economic injuries.[10] The record does not suggest that Maritz Inc. was ever presented with empirical evidence as to the extent of either Katherine's or Damian's personal or economic injuries.[11] The record is clear, however, that Maritz Inc. took seriously the various claims that Suelthaus asserted on Katherine's and Damian's behalf, believed that Katherine and Damian would litigate these claims if they were not settled, and made the settlement payments to discharge all such claims, for personal and economic injuries alike.[12] In these circumstances,

---

[10] On the basis of all the evidence, we do not believe that any part of the payments to Katherine and Damian was in redemption of Maritz Inc. stock. The redemption agreement was only for Maritz Inc. voting stock. Katherine owned only nonvoting stock. Damian owned no Maritz Inc. stock in his individual capacity. In his testimony, Backerman made clear that Maritz Inc. viewed the payments it made to discharge Katherine's and Damian's claims as being separate from the payments it made to redeem the Hobler voting stock.

[11] We note that before her termination, Katherine was earning a $56,700 salary as a corporate officer of Maritz Inc. and that Damian did $10,000 worth of business with the corporation over a 6-month period. The record does not suggest, however, any direct correlation between these figures and the amounts of the settlement payments.

[12] Backerman testified that Maritz Inc. took seriously the claims asserted by Suelthaus on Katherine's and Damian's behalf. He testified that "Maritz Inc., should not have, and did not, come to a resolution of the stock redemption issue without also clearing up these asserted claims, such as they were, and it

(continued...)

we use our best judgment to allocate the settlement payments. See <u>Stocks v. Commissioner</u>, 98 T.C. 1, 14 (1992); <u>Burditt v. Commissioner</u>, T.C. Memo. 1999-117; <u>Goeden v. Commissioner</u>, T.C. Memo. 1998-18; <u>Noel v. Commissioner</u>, T.C. Memo. 1997-113; see also <u>Cohan v. Commissioner</u>, 39 F.2d 540, 544 (2d Cir. 1930); <u>Eisler v. Commissioner</u>, 59 T.C. 634, 640-641 (1973). On the basis of the whole record, and bearing against petitioners, who have the burden of proof, we conclude that neither personal injury claims nor economic injury claims predominated in the calculus of Maritz Inc.'s reasons for making the settlement payments, but rather that both types of claims weighed equally, without distinction between Katherine's and Damian's claims. Accordingly, we conclude and hold that one-half of Katherine's and Damian's respective settlement payments are excludable from gross income under section 104(a)(2).

---

[12](...continued) would not have made sense for the company to be paying many millions of dollars to the Hoblers [for redemption of their stock] that they could use to pursue claims in court." He testified that Maritz Inc. "certainly" felt there was a possibility that Katherine and Damian would proceed to litigation unless their claims were settled. He testified that Katherine and Damian "were making demands, and in the overall it was just time to get this matter behind us." He testified that Maritz Inc. "did settle those claims and they would not have settled those claims if they thought they were totally worthless." We regard Backerman's testimony as especially creditable given that he was the attorney who negotiated the redemption agreement and settlement payments on behalf of Maritz Inc. We also note that he was called as respondent's witness.

We have considered all arguments the parties have raised. Arguments not addressed herein we have concluded are irrelevant or without merit.

To reflect the foregoing and the parties' concessions,

<u>Decisions will be entered under Rule 155</u>.